AMENDED OPINION*

*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 6**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

MIND & MOTION UTAH INVESTMENTS, LLC,
*Appellee,*

*v.*

CELTIC BANK CORPORATION,
*Appellant.*

No. 20131168
Filed January 27, 2016

Third District, Salt Lake
The Honorable Todd M. Shaughnessy
No. 110915222

Attorneys:

Steven W. Dougherty, Troy L. Booher, Leslie Kay Rinaldi,
Beth E. Kennedy, Salt Lake City, for appellant

Marcy G. Glenn, Denver, Nathan R Runyan,
Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM,
and JUDGE PEARCE joined.

Having recused himself, JUSTICE HIMONAS does not participate
herein; COURT OF APPEALS JUDGE JOHN A. PEARCE sat.

JUSTICE PARRISH sat for oral argument. Due to her resignation from
this court, she did not participate herein.

* The court has rewritten paragraph 45.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 Utah law recognizes two different kinds of promises parties make in a contract, covenants and conditions. Covenants are mutual obligations the parties bargain for in their agreement, and the failure to perform them generally gives rise to remedies for breach of contract. Conditions, on the other hand, are events not certain to occur, but which must occur before either party has a duty to perform under the contract. In contrast to covenants, the failure of a condition relieves the parties of any performance obligations, and neither may seek remedies for breach.

¶2 In this case, Mind & Motion entered into a real estate purchase contract (REPC) with Celtic Bank to buy a large piece of property the bank had acquired from a developer through foreclosure. Although the county had approved plans to construct condominiums on the land, the developer had not recorded the plats for the first phase of development. Accordingly, the REPC required Celtic Bank to record the plats by a certain date, and it allowed Mind & Motion sole discretion to extend the recording deadline as necessary to allow Celtic Bank enough time to record. It further provided that any extension of the recording deadline automatically extended the deadline to complete the transaction.

¶3 After extending the recording deadline once, Mind & Motion declined to extend it a second time and sued Celtic Bank for breach of contract. The district court granted summary judgment in Mind & Motion's favor, concluding that the recording provision was unambiguously a covenant, not a condition. It then awarded Mind & Motion $100,000 in liquidated damages and more than $200,000 in attorney fees, as well as the return of Mind & Motion's $100,000 earnest money deposit. On appeal, Celtic Bank argues that summary judgment was improper because the recording provision is unambiguously a condition. And in the alternative, it maintains that the agreement contains facial and latent ambiguities.

¶4 We agree with the district court that the language of the contract lends itself to just one plausible reading—that the recording provision is a covenant, not a condition. Under our caselaw, although it is true that the fulfillment of a condition often hinges on the action of a third party, conditions are also typically phrased using explicitly conditional terms. Here, Celtic Bank is correct that its ability to meet the recording deadline depended on when county officials decided to approve its application. But the parties employed explicitly mandatory language to characterize the recording

provision, while using explicitly conditional language elsewhere in the agreement. Based on these features of the REPC, we conclude that there is no plausible way to read the recording provision as anything other than a covenant.

¶5    We also conclude that there is no latent ambiguity in the REPC. Latent ambiguities arise only where unambiguous language mislabels a person or thing due to a collateral matter. And parties cannot make such a showing by merely submitting affidavits that set forth their own subjective understanding of particular terms. Here, Celtic Bank has not argued that any terms in the agreement fail to reflect the parties' intent due to some collateral matter. And even if it had, the only extrinsic evidence Celtic Bank submits are affidavits from bank officers describing their own subjective understanding of the recording provision. We therefore reject Celtic Bank's latent ambiguity argument and affirm the district court's summary judgment ruling.

## Background

¶6    On appeal from a motion for summary judgment, we view the facts and all reasonable inferences from them in the light most favorable to the nonmoving party, Celtic Bank.[1] The following recitation of the facts is consistent with that standard.

¶7    Celtic Bank acquired fourteen acres of real estate in Huntsville, Utah, through a foreclosure sale. The prior owner had partially completed four condominium units and received approval to construct more than 160 additional units. But the prior owner had not recorded the plat for the next phase of development, and neither had Celtic Bank after assuming ownership of the property.

¶8    Mind & Motion agreed to purchase the property from Celtic Bank in a real estate purchase contract executed May 25, 2010. The REPC described the property as including "[a]pproximately 14 acres with recorded PRUD for 168 units" and stated that Celtic bank was selling the property "AS RECORDED." The agreement required Mind & Motion to deposit $100,000 in earnest money with an escrow agent, which was fully refundable if the property did not pass a buyer's inspection. Mind & Motion could complete its inspections anytime within fifteen days after receiving notice that the property was substantially complete and that Celtic Bank had recorded the plat.

---

[1] *See Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 31, 116 P.3d 323.

¶9 The REPC also provided that Celtic Bank "shall record Phase 1" and "agrees to complete recording of Phase 1" of the development by June 15, 2010. It further provided that Celtic Bank "will accomplish any necessary construction or repairs required to complete recording of Phase 1." But it granted Mind & Motion "the sole discretion" to extend the deadline "as necessary to allow" Celtic Bank to record. If Mind & Motion extended the deadline, "the Evaluations and Inspection Deadline and the Settlement deadline" would be "automatically extended by the same amount of time."

¶10 The recording process requires an applicant to obtain approval from a number of different entities. First, the Weber County Planning Commission requires "an applicant to complete a required landscaping or infrastructure improvement prior to any plat recordation or development activity."[2] After the planning commission approves a final plat, the commission submits it to the county surveyor, county health department, and county engineer for signatures.[3] After the county engineer approves the plat, the engineer submits it to the county attorney and the board of county commissioners for their approval.[4] An applicant who jumps through each hoop is entitled to record—county officials do not have discretion to decline an application that complies with the applicable zoning ordinances.[5]

¶11 The REPC also contained a "time is of the essence clause," which provided that "[u]nless otherwise explicitly stated in this Contract," performance must be completed "by 5:00 PM Mountain Time" on the applicable deadline. The clause also stated that "[p]erformance dates and times referenced herein shall not be binding upon title companies, lenders, appraisers, and others not parties to this Contract, except as otherwise agreed to in writing by such non-party."

¶12 In the event Mind & Motion defaulted, the REPC allowed Celtic Bank to keep the earnest money as liquidated damages. If Celtic Bank defaulted, Mind & Motion would receive back its earnest money and could either sue to specifically enforce the contract or obtain $100,000 in liquidated damages.

---

[2] *See* UTAH CODE §§ 17-27a-604(1)(b)(i), -604.5(2)(a).

[3] WEBER COUNTY, UTAH, ORDINANCES § 106-1-8(d)(1).

[4] *Id.*

[5] *See Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 30, 979 P.2d 332.

¶13 The day the parties signed the REPC, the planning commission recommended final approval of recording the phase 1 plat. But several entities still needed to approve various aspects of Celtic Bank's application. None of them approved the plat by the June 15 recording deadline, and Mind & Motion accordingly extended it to July 26.

¶14 That date came and went, however, without the application being approved, and rather than extend the deadline a second time, Mind & Motion claimed Celtic Bank had breached the contract and demanded the return of its earnest money as well as the payment of liquidated damages. Celtic Bank refused to pay, so Mind & Motion filed a breach of contract action. The district court granted Mind & Motion partial summary judgment on its breach of contract claim, concluding that the recording provision was unambiguously a covenant, not a condition. It reasoned that because the REPC phrased Celtic Bank's recording obligation in mandatory terms—the bank "shall record Phase 1"—there was no plausible way to read the provision as anything other than a covenant. Celtic Bank appeals. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶15 Celtic Bank argues that the REPC's recording provision is unambiguously a condition, not a covenant, and that the district court therefore erred in granting summary judgment in Mind & Motion's favor. In the alternative, the bank argues that the provision is at least reasonably susceptible to either reading and is therefore facially ambiguous. Additionally, Celtic Bank has urged us to consider affidavits from two of its officers that it argues show a latent ambiguity in the contract. We review a district court's decision granting summary judgment for correctness, viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."[6] Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] The interpretation of a contract is legal question, which we also review for correctness.[8]

**Analysis**

¶16 We conclude that the district court correctly granted summary judgment in Mind & Motion's favor. Although Celtic Bank's ability to meet the recording deadline hinged in large part on the approval of county officials, the parties couched the recording obligation in mandatory language while employing explicitly conditional language elsewhere in the REPC to describe other performance obligations. This shows that Celtic Bank and Mind & Motion, both sophisticated parties, knew how to draft a condition when they so desired. Accordingly, it is not plausible to read Celtic Bank's duty to record the phase 1 plat as anything other than a covenant, and the REPC is therefore not facially ambiguous.

¶17 We also conclude that Celtic Bank has failed to establish a latent ambiguity in the contract. Latent ambiguities arise only when a collateral matter—such as trade usage, course of dealing, or linguistic context—shows that a contract's terms mislabel a person or thing or otherwise fail to reflect the parties' intentions. And extrinsic evidence is only relevant to such a determination if it is objective. Here, because Celtic Bank has submitted affidavits from its officers setting forth their own subjective understanding of the agreement, it

---

[6] *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (internal quotation marks omitted).

[7] UTAH R. CIV. P. 56(a); *see also Orvis*, 2008 UT 2, ¶ 13.

[8] *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263.

has failed to submit any credible evidence relevant to establishing a latent ambiguity. For these reasons, we affirm the district court's decision.

## I. The REPC Is Unambiguous as to the Nature of Celtic Bank's Recording Obligation

¶18  Because resolving the parties' dispute hinges on whether the recording obligation is a covenant or a condition, we first discuss the key differences between these types of obligations. We then analyze the relevant provisions of the REPC and conclude that the only plausible way to read Celtic Bank's recording obligation is as a covenant. As we explain in more detail below, this is primarily because the obligation is phrased in explicitly mandatory terms despite the parties' use of conditional language to characterize other performance obligations. For that reason, even though Celtic Bank could not control the precise timing of recordation, the language the parties' employed cannot plausibly be read as creating a conditional obligation. Rather, the plain language of the agreement shows that Celtic Bank agreed to shoulder the same type of regulatory risk businesses routinely assume in such contracts.

### A. Covenants and Conditions

¶19 The distinction between covenants and conditions is an important one because each imposes qualitatively different kinds of obligations. A covenant is a "promise[] between the parties to the contract about their mutual obligations."[9] In essence, covenants are the core bargained-for exchange of an agreement. They create specific legal duties, the violation of which gives rise to remedies for breach of contract.[10]

¶20 Conditions are different. "A condition is 'an event, not certain to occur, which must occur . . . before performance under a contract becomes due.'"[11] We have noted three principal differences between conditions and covenants. First, the parties to the contract have no duty to perform until the condition is fulfilled, so the failure

---

[9] *McArthur v. State Farm Mut. Auto. Ins. Co.*, 2012 UT 22, ¶ 28, 274 P.3d 981 (alteration in original) (quoting HOWARD O. HUNTER, MODERN LAW OF CONTRACTS § 10:1 (2012)).

[10] *Id.*

[11] *Id.* ¶ 29 (alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 224 (AM. LAW INST. 1981)).

of a condition relieves the parties of all of their contractual duties.[12] Second, the parties have no remedy for breach of contract if a condition is not fulfilled, because at that point there is simply no contract to breach.[13]

¶21 Third, conditions "typically fall outside the control of the parties to the contract, often requiring some environmental trigger (such as 'weather permitting') or action by a third party (such as 'upon the lender's approval') for the contract to begin."[14] Stated differently, even if one of the parties has some influence over the fulfillment of a condition, "its incidence usually is a matter of fate or of the decision of one or more third parties."[15] Covenants, by contrast, "are almost always within the control of the contracting parties."[16]

¶22 To determine whether a contractual obligation is a covenant or a condition, we examine the language of the provision in question and the nature of the agreement itself.[17] In *McArthur v. State Farm Mutual Automobile Insurance Co.*, for example, we held that an exhaustion clause in an insurance policy was a condition, not a covenant, for two reasons: (1) its fulfillment was outside the control of the contracting parties, and (2) the parties employed conditional language to characterize the exhaustion requirement in the agreement.[18] The clause provided in part that the insured would have "NO COVERAGE UNTIL" coverage limits on a separate bodily injury insurance policy had been "USED UP."[19] We noted that the "word 'until' exemplifies a word[] of condition"[20] and that satisfying the exhaustion condition was "dependent on the actions of a non-

---

[12] *Id.*

[13] *Id.* ¶ 30.

[14] *Id.* ¶ 31 (citing HUNTER, *supra* note 9, § 10:1).

[15] *Id.* (quoting HUNTER, *supra* note 9, § 10:1).

[16] *Id.* (quoting HUNTER, *supra* note 9, § 10:1).

[17] *See* RESTATEMENT (SECOND) OF CONTRACTS § 226 cmt. a (AM. LAW INST. 1981) ("An intention to make a duty conditional may be manifested by the general nature of the agreement, as well as by specific language.").

[18] *McArthur*, 2012 UT 22, ¶¶ 33–34.

[19] *Id.* ¶ 33.

[20] *Id.* (alteration in original) (internal quotation marks omitted).

contracting third party—the liability insurer."[21] Accordingly, we concluded that exhaustion of the other policy's limits was "the very event, not certain to occur, which must occur . . . before performance under a contract becomes due."[22]

¶23 Our analysis in *McArthur* indicates that express terms like "unless," "on condition that," "provided that," and "if," often create conditions.[23] This implies that more mandatory terms, such as "shall," "must," or "agree," will often create covenants. That is not to say that such terms are talismans—regardless of the precise terms used in the contract, the parties' degree of control over the fulfillment of an obligation remains "a significant indication" of whether the parties intended a performance obligation to be a condition or a covenant.[24] But when parties employ mandatory terms to characterize an obligation whose fulfillment hinges on the action of a third party, this may indicate an express assumption by one party of the risk that the condition will remain unfulfilled.[25]

### B. The Recording Obligation Is Unambiguously a Covenant

¶24 Having set forth the key distinctions between covenants and conditions, we now discuss whether the district court correctly interpreted the REPC's recording provision as a covenant. When interpreting a contract, our task is to ascertain the parties' intent.[26] And the best indication of the parties' intent is the ordinary meaning of the contract's terms.[27] Accordingly, "[i]f the language within the four corners of the contract is unambiguous, the parties' intentions

---

[21] *Id.*

[22] *Id.* (alteration in original) (internal quotation marks omitted).

[23] *Id.* ¶ 32; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 226 cmt. a (1981).

[24] *See McArthur*, 2012 UT 22, ¶ 37; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 226 cmt. a (1981).

[25] *See* RESTATEMENT (SECOND) OF CONTRACTS § 227 cmt. b (AM. LAW INST. 1981) (noting that "even without clear language" indicating whether an obligation outside of the parties' control is a covenant or a condition, "circumstances may show that [one party] assumed the risk of its non-occurrence").

[26] *See Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, ¶ 34, 308 P.3d 424.

[27] *See Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185.

are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."[28] A contract is facially ambiguous if its terms are "capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[29] But terms are not ambiguous "simply because one party seeks to endow them with a different interpretation according to his or her own interests."[30] Rather, the proffered alternative interpretations "must be plausible and reasonable in light of the language used."[31] If the parties' intentions cannot be determined from the face of the contract, "extrinsic evidence must be looked to in order to determine the intentions of the parties."[32]

¶25 Applying these principles, we conclude that the REPC is facially unambiguous. While Mind & Motion's preferred reading of the agreement is strongly supported by the REPC's plain terms, Celtic Bank's interpretation finds no such support in the language of the contract. Below, we examine each party's proffered interpretation of the REPC in turn.

1. Mind & Motion's Reading of the REPC Is Strongly Supported by the Language of the Agreement

¶26 Mind & Motion urges us to affirm the district court's conclusion that the recording provision is unambiguously a covenant, citing the mandatory language in the agreement. For several reasons, we agree that this reading of the REPC receives strong support from the language of the contract.

¶27 First, the recording provision states that Celtic Bank "shall record [the] Phase 1" plat "no later than 90 calendar days from accepted offer." The next paragraph also states that Celtic Bank "agrees to record" the plat. As we have discussed, when interpreting a contract, we generally give each term its plain and ordinary

---

[28] *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 19, 54 P.3d 1139 (internal quotation marks omitted).

[29] *Id.* ¶ 20 (internal quotation marks omitted).

[30] *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428.

[31] *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998).

[32] *WebBank*, 2002 UT 88, ¶ 19 (internal quotation marks omitted).

meaning.[33] And here, Black's Law Dictionary defines "shall" as "a duty to," "is required to," or "mandatory."[34] We have also held that the legislature's use of the word "shall" in statutes creates mandatory obligations.[35] And while it is true, as Celtic Bank argues, that "shall" can be directory or express a future expectation, it is "the mandatory sense that drafters typically intend and that courts typically uphold."[36] The word "agree" similarly means to "exchange promises" or "to unite in an engagement to do or not do something."[37] Our court of appeals has also interpreted the word "agree" to create a covenant rather than a condition.[38]

¶28 These mandatory terms contrast sharply with the explicitly conditional language in *McArthur* that we held created a condition.[39] There, as we have discussed, the contract provided that no insurance coverage would be provided "until" other coverage had been exhausted. And we noted that the "word 'until' exemplifies a word[] of condition."[40] The recording provision, of course, contains no such language.

¶29 Second, not only is the recording obligation phrased in mandatory terms, but the parties used explicitly conditional language in other provisions of the REPC. For instance, paragraph eight provides, "Buyer's obligation to purchase under this Contract *is conditioned* upon Buyer's approval of the content of each of the

---

[33] *Glenn*, 2009 UT 80, ¶ 10 ("[T]he parties' intentions are determined from the plain meaning of the contractual language . . . ." (internal quotation marks omitted)).

[34] *Shall*, BLACK'S LAW DICTIONARY (9th ed. 2009).

[35] *See Ramsay v. Kane Cty. Human Res. Special Serv. Dist.*, 2014 UT 5, ¶ 10, 322 P.3d 1163.

[36] *Shall*, BLACK'S LAW DICTIONARY (9th ed. 2009).

[37] *Agree*, BLACK'S LAW DICTIONARY (9th ed. 2009).

[38] *See, e.g., Baxter v. Saunders Outdoor Advert., Inc.*, 2007 UT App 340, ¶¶ 11–12, 171 P.3d 469 (interpreting an obligation as a covenant in a contract that stated, "It is *agreed* that the terms of this lease shall commence upon completion of the installation of the structure which is the subject matter of this lease agreement" (emphasis added)).

[39] 2012 UT 22, ¶ 32, 274 P.3d 981.

[40] *Id.* ¶ 34 (alteration in original) (internal quotation marks omitted).

Seller Disclosures referenced in Section 7 [and] *is conditioned* upon Buyer's approval of the following tests and evaluations." (Emphasis added). This shows that Mind & Motion and Celtic Bank, both sophisticated parties, understood how to consciously identify a condition precedent when they so desired.[41]

¶30 Finally, the recording provision also must be satisfied by a specific date. The REPC contains a "time is of the essence clause," stating that "performance under each Section of this Contract which references a date shall absolutely be required by 5:00 PM Mountain Time on the stated date." While it is true that deadlines can be coupled with conditions,[42] the REPC explicitly makes all deadlines "absolute . . . require[ments]."

¶31 Standing alone, language of this kind could conceivably be found to be a conditional obligation, depending on a particular contract's operation and surrounding terms. But together, these features of the REPC—mandatory language, a hard deadline for performance, and other provisions that employ conditional language—strongly suggest that the parties intended the recording provision to operate as covenant, not a condition.

¶32 We therefore conclude that Mind & Motion's reading of the contract is strongly supported by the language of the agreement. Consequently, in order for the contract to be facially ambiguous, Celtic Bank's alternative reading must also be reasonably supported by the language of the agreement. For a variety of reasons, however, we conclude that it is not.

2. Celtic Bank's Reading of the REPC Receives No Support from the Agreement's Plain Terms

¶33 In arguing that the recording provision is a condition, Celtic Bank relies heavily on the fact that the county ultimately controlled the timing of recordation. It argues that "parties may manifest their intent to create a condition 'by clear implication'" and cites *McArthur* for the proposition that conditions generally fall outside the control

---

[41] *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179 ("We will not make a better contract for the parties than they have made for themselves. Nor will we avoid the contract's plain language to achieve an 'equitable' result." (citation omitted)).

[42] *See* RESTATEMENT (SECOND) OF CONTRACTS § 225 cmt. a (1981) ("The time within which the condition can occur in order for the performance of the duty to become due may be fixed by a term of the agreement . . . .").

of the contracting parties, "often requiring some environmental trigger . . . or action by a third party . . . for the contract to begin."[43] And here, Celtic Bank maintains, there is no dispute that it needed approval from the planning commission, engineers, and other county officials before the phase 1 plat could be recorded.[44] So even though Celtic Bank "controlled whether it completed the various . . . lists of tasks that were prerequisite to the county's approval and recordation process," no ordinance required the county to "approve the Phase 1 plat" by the recording deadline. As a result, Celtic Bank argues, "whether the county approved the Phase 1 plat before the deadline was beyond [its] control." Celtic Bank also argues that none of Mind & Motion's performance obligations became due until the phase 1 plat was recorded, which is consistent with one of the touchstones of conditions precedent we outlined in *McArthur*.[45]

¶34 We have no quarrel with Celtic Bank's description of the recording process. It seems clear that even if Celtic Bank complied with the county's every demand, the county officials ultimately controlled the *timing* of the recordation—not Celtic Bank. Celtic Bank is also correct that the deadline for performing many of its obligations under the REPC was automatically extended whenever Mind & Motion extended the recording deadline. But we do not agree that these aspects of the agreement are sufficient to override the explicit mandatory language in the REPC.

¶35 It is a basic principle of contract law that parties are generally "free to contract according to their desires in whatever terms they can agree upon."[46] This includes assuming risks that third parties or external environmental circumstances will fail to conform to the parties' expectations.[47] And absent language in the contract to

---

[43] *McArthur*, 2012 UT 22, ¶ 31; *accord Cheever v. Schramm*, 577 P.2d 951, 953 (Utah 1978) ("The intention to create a condition in a contract must appear expressly or by clear implication.").

[44] *See supra* ¶ 10.

[45] *McArthur*, 2012 UT 22, ¶ 29.

[46] *Russell v. Park City Utah Corp.*, 548 P.2d 889, 891 (Utah 1976).

[47] *See Bitzes v. Sunset Oaks, Inc.*, 649 P.2d 66, 69–70 (Utah 1982) (enforcing the unambiguous language of a real estate purchase contract even though "delays in final approval of Plat 'B' caused by neighborhood opposition and governmental review" rendered "performance of the agreement . . . a substantially less profitable

(Continued)

the contrary, "[a] party who contracts knowing that governmental permission or license will be required ordinarily assumes the obligation of assuring that permission will be granted."[48]

¶36 For example, in *Central Utah Water Conservancy District v. Upper East Union Irrigation Co.*, a water district entered into a contract with several irrigation companies to make specific improvements to its irrigation systems in exchange for rights to the increased water flow.[49] The water district failed to complete the promised improvements to its irrigation systems, however, citing "environment[al] and permitting concerns."[50] The irrigation companies sued for breach of contract, and the district court eventually granted summary judgment in their favor.[51] On appeal, the water district argued that it was impossible to secure state and federal permits because "[t]he contemplated design" of the irrigation improvements "was inconsistent" with federal and state regulations.[52] We affirmed the district court, holding that the water district "explicitly undertook the obligation of obtaining the necessary permits," so "its performance under the Agreement was not contingent on its ability to do so."[53] In so holding, we noted that by signing a contract providing that the water district "*shall obtain* all construction permits required by" state and federal law, the water district "assumed the risk that such permits may be difficult, or even impossible, to obtain."[54]

¶37 Like the water district in *Central Utah Water*, Celtic Bank signed an agreement that phrased its recording obligation in mandatory terms even though fulfilling that obligation required third-party approval. And as even Celtic Bank concedes, so long as its application complied with the applicable zoning ordinances, "the

---

transaction than originally anticipated," and noting that these events were "contingencies the respondent, as an experienced real estate developer, could have foreseen and covered in the contract").

[48] 14 JAMES P. NEHF, CORBIN ON CONTRACTS § 76.5 (2001).

[49] 2013 UT 67, ¶ 1, 321 P.3d 1113.

[50] *Id.* ¶ 7 (alteration in original).

[51] *Id.* ¶¶ 8–12.

[52] *Id.* ¶ 29 (alteration in original).

[53] *Id.* ¶ 32.

[54] *Id.*

county's eventual approval was nearly guaranteed." So this is not a case where government permits are "difficult, or even impossible, to obtain," and even if it were, the language of the agreement strongly indicates that Celtic Bank "assumed the risk" that its application would not be approved before the recording deadline.[55] We therefore conclude that it is simply not plausible to read the recording provision as a condition, and therefore the REPC is not facially ambiguous.

## II. There Is No Latent Ambiguity in the REPC

¶38 Having concluded that the REPC is not facially ambiguous, we now turn to Celtic Bank's argument that there is a latent ambiguity in the REPC. Celtic Bank relies on language from *Ward v. Intermountain Farmers Ass'n* for the proposition that "any relevant evidence *must* be considered" when "determining whether a contract is ambiguous."[56] Accordingly, it urges us to consider affidavits submitted by its chief lending officer and chief executive officer stating that they understood the recording provision as a conditional obligation when they negotiated and signed the REPC.

¶39 We decline to consider the affidavits and conclude that there is no latent ambiguity in the REPC. Latent ambiguities arise only where a collateral matter arising after the contract is executed renders otherwise clear terms ambiguous. And affidavits setting forth the parties' subjective understanding of contractual terms are insufficient to make this showing. Here, Celtic Bank does not argue that a collateral matter rendered the REPC's terms ambiguous, nor does it offer the type of extrinsic evidence relevant to such a determination. We therefore reject its argument that the REPC contains a latent ambiguity.

¶40 Before addressing Celtic Bank's latent ambiguity argument, we first take the opportunity to clarify the conditions under which latent ambiguities arise and the evidence relevant to establishing them. Unlike facial ambiguities, a "latent ambiguity 'arises from a collateral matter when the document's terms are applied or

---

[55] *Id.*

[56] 907 P.2d 264, 268 (Utah 1995) (emphasis added); *accord Watkins v. Ford*, 2013 UT 31, ¶ 26, 304 P.3d 841 ("'When determining whether a contract is ambiguous, any relevant evidence must be considered' and 'the better-reasoned approach is to consider the writing in light of the surrounding circumstances.'" (quoting *Ward*, 907 P.2d at 268)).

executed,'" not from any facial deficiency in the contract's terms.[57] So, "[b]y its very nature, a latent ambiguity is one that cannot be found within the four corners of the document but is only discoverable through the introduction of extrinsic evidence."[58] But we have also recognized that instances where extrinsic evidence is allowed to "uncover" a latent ambiguity "will prove to be the exception and not the rule."[59] Parties may not simply proffer subjective affidavits setting forth their favored interpretation of otherwise clear terms to create an ambiguity. Rather, the extrinsic evidence must show that due to some collateral matter — trade usage, course of dealing, or some other linguistic particularity that arises in the context of extrinsic collateral matters — the contract's terms mislabel a person or thing, or otherwise fail to reflect the parties' intentions.[60]

¶41 For example, in *Watkins v. Ford*, a buyer contracted with a car dealership to preorder a Ford concept car, the "GT40."[61] Before Ford made the cars available for sale, however, it shortened the name to "GT."[62] When the dealership refused to sell the buyer a GT at the price mentioned in their agreement, the buyer filed suit for breach of contract.[63] The district court granted summary judgment in the dealership's favor, holding that the contract unambiguously required the dealership to sell "GT40s to [the buyer], not the GTs."[64]

---

[57] *Watkins*, 2013 UT 31, ¶ 28 (quoting *Ambiguity*, BLACK'S LAW DICTIONARY (9th ed. 2009)).

[58] *Id.*

[59] *Daines v. Vincent*, 2008 UT 51, ¶ 30 n.5, 190 P.3d 1269.

[60] *See id.; see also Watkins*, 2013 UT 31, ¶ 30; *Barraford v. T & N Ltd.*, 778 F.3d 258, 266 (1st. Cir. 2015) (noting that the latent ambiguity rule "typically applies only in a narrow set of circumstances in which 'a word, thought to have only a single meaning, actually has two or more meanings,' RICHARD A. LORD 11 WILLISTON ON CONTRACTS § 33:43 (4th ed.), such as when a word 'denotes more than one actual thing' or 'designates something particular within the industry's jargon.' *Coffin v. Bowater Inc.*, 501 F.3d 80, 97 (1st Cir. 2007).").

[61] *Watkins*, 2013 UT 31, ¶¶ 7, 30.

[62] *Id.* ¶ 11.

[63] *Id.* ¶ 13.

[64] *Id.* ¶ 14 (internal quotation marks omitted).

We reversed, holding that there was a latent ambiguity in the contract.[65] We so held because undisputed extrinsic evidence showed "that when the [contract was] executed, both parties were in agreement regarding the particular car for which they were contracting—the production version (eventually designated the Ford 'GT') of Ford's concept car, the 'GT40.'"[66] So there was "no dispute as to the identity of the vehicles for which the parties contracted," even though the terms of the agreement failed to correctly reflect their intentions.[67]

¶42 As illustrated by *Watkins*, latent ambiguities do not arise unless matters collateral to the contract cast doubt on the interpretation of terms that otherwise appear clear and unambiguous. Such matters may include trade usage, the mislabeling of a person or thing, or linguistic context.[68] Parties cannot create a latent ambiguity by simply "seek[ing] to endow" clear terms "with a different interpretation according to his or her own interests."[69] That is, latent ambiguities are *objectively* verifiable and ordinarily cannot be proven based on the parties' *subjective* understanding of contractual terms.[70] Therefore, affidavits and other evidence that fails to identify a collateral matter are not "relevant" to showing a latent ambiguity. As the Seventh Circuit observed in an opinion authored by Judge Posner, when considering extrinsic evidence of a latent ambiguity,

---

[65] *Id.* ¶¶ 28–30.

[66] *Id.* ¶ 30.

[67] *Id.*

[68] *See AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995) ("Suppose the parties to [a] contract . . . had been members of a trade in which the term 'cotton' was used to refer to guncotton rather than to the cotton used in textiles. The ordinary reader of English would not know about this special trade usage, and so would suppose the contract unambiguous. Again, the [latent] ambiguity is in the reference, that is, the connection between the word and the object that it denotes.").

[69] *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428.

[70] Of course, where parties stipulate that a term in their agreement adopted "an idiosyncratic meaning, the court will honor their agreement." *See AM Int'l*, 44 F.3d at 576.

the key is the distinction between what might be called "objective" and "subjective" evidence of ambiguity. . . . By "objective" evidence we mean evidence of ambiguity that can be supplied by disinterested third parties: evidence that there was more than one ship called *Peerless,* or that a particular trade uses "cotton" in a nonstandard sense. The ability of one of the contracting parties to "fake" such evidence, and fool a judge or jury, is limited. By "subjective" evidence we mean the testimony of the parties themselves as to what they believe the contract means. Such testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify. "Objective" evidence is admissible to demonstrate that apparently clear contract language means something different from what it seems to mean; "subjective" evidence is inadmissible for this purpose.[71]

¶43 Here, Celtic Bank has not identified any particular term in the REPC as latently ambiguous, nor has it offered any objective evidence that a collateral matter rendered a term in the recording provision ambiguous. Instead, the bank offers sworn testimony from its chief lending officer asserting generally that he "understood that Mind & Motion had a right . . . to terminate the transaction if the Phase 1 plat were not recorded by the deadline," and that "[i]t was never Celtic Bank's intention to, in effect, gamble that it could record a plat on the Property." Celtic Bank's chief executive officer also makes general assertions in an affidavit that he believed if the plat were not recorded by the deadline, the parties simply "would no longer have a viable transaction to proceed with."

¶44 Celtic Bank argues that we can consider these affidavits because "this litigation is [a] 'collateral matter' that shed[s] light on the latent ambiguity." But accepting this assertion would broaden the latent ambiguity rule beyond all recognition. If litigation qualified as a collateral matter, any party to a contract dispute could create an ambiguity by going to court and submitting affidavits setting forth their subjective understanding of otherwise unambiguous terms. Contrary to our precedent, this would allow

---

[71] *Id.* at 575; *see also Coffin v. Bowater Inc.*, 501 F.3d 80, 98–99 (1st Cir. 2007) (adopting standard in *AM Int'l*); *Evergreen Invs., LLC v. FCL Graphics, Inc.*, 334 F.3d 750, 757 (8th Cir. 2003) (same); *Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 992 n.2 (2d Cir. 1997) (same).

parties "to create ambiguity out of whole cloth,"[72] swallowing the general rule prohibiting consideration of extrinsic evidence absent a facial ambiguity. We therefore reject it and decline to consider the affidavits Celtic Bank has submitted. For all these reasons, we conclude that there is no latent ambiguity in the REPC.

## Conclusion

¶45 We conclude that Celtic Bank's recording obligation outlined in the REPC is unambiguously a covenant. Even though Celtic Bank could not ultimately control when the county issued its final approval to record the phase 1 development, the recording obligation is framed in mandatory language, and the REPC employs explicitly conditional language elsewhere in the agreement. We also conclude that Celtic Bank has failed to establish a latent ambiguity in the contract. Affidavits that seek to endow otherwise clear language with an alternative meaning are insufficient. We therefore affirm the district court's ruling in its entirety. As a final matter, Mind & Motion has requested it be awarded attorney fees and costs incurred on appeal, and the parties have stipulated to such an award. We accordingly remand for the calculation of reasonable fees and costs.

---

[72] *Watkins*, 2013 UT 31, ¶ 28 n.2.