2022 UT App 6

# THE UTAH COURT OF APPEALS

NEAL K. OSTLER,
Appellant,
*v.*
DEPARTMENT OF PUBLIC SAFETY, ET AL.,[1]
Appellees.

Opinion
No. 20200395-CA
Filed January 21, 2022

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 190905617

Aaron C. Garrett, Attorney for Appellant

Sean D. Reyes and Joshua Davidson, Attorneys
for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

TENNEY, Judge:

¶1     Neal K. Ostler sued a group of state actors for allegedly violating the terms of a prior settlement agreement. After the district court dismissed Ostler's complaint, Ostler moved to amend it. The court denied the motion to amend without specifying its reasoning.

---

1. The parties on appeal are not limited to those listed, but also include other parties whose names appear on the notice of appeal or who have otherwise entered appearances in this court.

¶2    Ostler now appeals the denial of his motion to amend. In response, the state actors argue that the denial was appropriate because the amended complaint would have been dismissed as a matter of law and was therefore futile. Because we conclude otherwise, we reverse the court's ruling.

BACKGROUND

*The Release Agreement*

¶3    Ostler was employed by various public entities in Utah for over two decades. After he was placed on a reduction in force list in the early 1990s, Ostler sued, alleging, among others, wrongful termination and breach of contract. Ostler included the Utah Department of Commerce, the Utah Department of Corrections, the Utah Department of Public Safety, and the then-heads of those departments as defendants (the Defendants).[2]

¶4    In 1996, Ostler and the Defendants entered into a release agreement. In exchange for Ostler dismissing his suit, the Defendants agreed to pay Ostler $50,000 and reinstate him "on paper only" for a specified timeframe so that he could apply for retirement.

¶5    The agreement also included a provision that set forth the Defendants' obligations if they were ever contacted by "potential or prospective employers of Ostler" (the Contact Provision). In this Contact Provision, the parties agreed that

---

2. Ostler's original complaint and the 2019 complaint discussed below both named the same State departments as defendants. The complaints named different individuals, however, because department leadership changed in the interim. For simplicity, we refer to both groups collectively as "the Defendants," even though different individuals were named in the complaints.

> [i]f the Defendants and/or the State of Utah are contacted by any potential or prospective employers of Ostler, or any other third party concerning prospective employment, the State of Utah shall comply with all laws, rules and regulations, concerning the disclosure of information pertaining to Ostler, including DHRM Human Resource management rules.

*Ostler's 2019 Complaint*

¶6    In 2019, Ostler filed a complaint against the Defendants. In this complaint, Ostler alleged that the Defendants had breached the release agreement and the covenant of good faith and fair dealing. According to Ostler, the Defendants had agreed to not "interfere with Mr. Ostler's ability to seek reemployment (within the State system or otherwise)." He then alleged that "the State [had] yet to fulfill its obligation to appoint Mr. Ostler to a position for which he is qualified" and that it had also "stifled or blocked his efforts, in violation of the 1996 [release] agreement." Ostler also alleged that he had tried to apply for public positions but had "experienced such occurrences such as suspiciously 'lost' applications, inexplicably 'deleted' profiles, and the like."

*The Defendants' Motion to Dismiss*

¶7    The Defendants moved to dismiss Ostler's complaint, arguing that the complaint did "not allege breach of actual contract terms."

¶8    While Ostler had asserted that the release agreement envisioned him seeking reemployment "within the State system or otherwise," the Defendants argued that the Contact Provision applied only if Ostler sought "new employment from *third parties*, not the State of Utah." (Emphasis in original.) According to the Defendants, even if state actors "did block an application

for state employment from Ostler, it would not breach the" release agreement or any implied covenant. The Defendants also argued that, even if Ostler's interpretation was correct, he had not alleged that the Defendants disclosed information to any of his "potential or prospective employers."

¶9 In response, Ostler argued that the Contact Provision's "prohibition on interference" applied "to the State of Utah, its subdivisions, and to other third party employers." Alternatively, Ostler contended that his claims could not be dismissed because the Contact Provision "contains a certain level of ambiguity."

*The District Court Dismisses Ostler's Complaint*

¶10 The district court held a hearing on the motion to dismiss. At the hearing, the court asked Ostler's counsel about Ostler's attempts to find employment. In response, counsel admitted that Ostler had not "applied to positions outside of the state system."

¶11 In a subsequent written decision, the court dismissed Ostler's claims with prejudice. On the breach of contract claim, the court concluded that the Contact Provision was "not implicated" by Ostler's claims because Ostler did not allege "that one of [Ostler's] prospective employers or another third party contacted Defendants."

¶12 On Ostler's allegation that the Defendants breached the implied covenant of good faith and fair dealing, the court concluded that the release agreement does not "contemplate the obligations alleged in the Complaint" and "does not impose an implied covenant of good faith and fair dealing concerning [Ostler's] applications for State employment." The court also concluded that the release agreement was "not ambiguous."

*Ostler's Amended Complaint*

¶13 After the court's dismissal, Ostler moved for leave to file an amended complaint. In his proposed amended complaint,

Ostler alleged that he had applied for jobs with the Utah Department of Transportation, the Utah Department of Corrections, and Salt Lake Community College. Ostler alleged that each of these "potential employers" had "contacted Defendants to inquire about Mr. Ostler's prior employment" and that the Defendants had "disclosed and released false, fraudulent, defamatory, or otherwise incorrect information about Mr. Ostler's prior work history with the State of Utah . . . contrary to DHRM Human Resource management rules." In his motion to amend, Ostler then asserted that these new allegations "cure[d] the pleading deficiencies" in his 2019 Complaint because they asserted that (i) potential State employers had contacted the Defendants and (ii) the Defendants had disclosed information to those potential employers in violation of the Contact Provision.

¶14    The Defendants opposed Ostler's motion to amend for three reasons.

¶15    First, the Defendants argued that Ostler could not file an amended complaint because the court had dismissed his claims with prejudice. The Defendants reasoned that before Ostler could "seek leave to amend," he needed to "seek reconsideration" under rule 60 of the Utah Rules of Civil Procedure. Because Ostler did not present grounds for reconsideration under rule 60, the Defendants argued that he was not entitled to his requested relief.

¶16    Second, the Defendants contended that leave to amend should be denied even "by the comparatively liberal standards of Rule 15." *See* Utah R. Civ. P. 15; *see also ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 26, 309 P.3d 201 (explaining what factors a court must weigh when ruling on a motion to amend). Applying the traditional rule 15 factors, the Defendants asked the court to conclude that the request to amend was untimely, that Ostler was not justified in the delay, and that any amendment would be prejudicial to the Defendants.

¶17 Third, the Defendants asserted that Ostler's proposed amendment was "futile." The Defendants again argued that the Contact Provision did not apply if "the State of Utah or its agencies" contacted the Defendants. Because Ostler's amended complaint only alleged that he applied for jobs with the State of Utah, the Defendants argued that he had "not alleged a viable claim."

¶18 The court denied Ostler's motion to amend. The court's reasoning was contained in just one sentence: "For reasons set out in Defendants' Opposition, Plaintiff's Motion for Leave to File Amended Complaint is denied." The court did not otherwise clarify which of the reasons given by the Defendants it was relying on.

¶19 Ostler timely appealed.

ISSUE AND STANDARD OF REVIEW

¶20 The sole issue on appeal is whether the court erred when it denied Ostler's motion for leave to file an amended complaint. We ordinarily review the "denial of motions for leave to amend under an abuse of discretion standard." *Haik v. Jones*, 2018 UT 39, ¶ 11, 427 P.3d 1155. But when "the purported futility of the amendment justifies the denial of a motion to amend, we review for correctness." *Id.* ¶ 16.[3]

---

3. Ostler's notice of appeal included the district court's ruling granting the Defendants' motion to dismiss Ostler's 2019 Complaint. In his brief, Ostler likewise argued that the court erred when it granted the motion to dismiss. But at oral argument, Ostler clarified that he was only appealing the court's denial of his motion to amend. We therefore do not review the court's decision to grant the Defendants' motion to dismiss.

(continued…)

ANALYSIS

¶21 Ostler challenges the district court's decision denying his motion to amend his complaint. Before we can address the merits of that ruling, however, we must first decide what the basis for that ruling actually was.

¶22 The Defendants asked the district court to deny Ostler's motion to amend for three reasons. But when the court later denied the motion, it did so "[f]or reasons set out in Defendants' Opposition." The court did not clarify whether it was relying on all or just some of the reasons given by the Defendants.

¶23 When there are multiple possible bases for a ruling, a district court should explain which of those bases it is (or is not) relying on. Such specificity is important in any case to facilitate meaningful appellate review. *See, e.g.*, *Veracity Networks LLC v. MCG S. LLC*, 2019 UT App 53, ¶ 37, 440 P.3d 906 ("Because we lack insight into the district court's rationale for its decision, we cannot effectively review it."). And this is particularly important where "our ability to meaningfully review" an issue is in any way "dependent upon the trial court's reasons for its ruling." *State v. De La Rosa*, 2019 UT App 110, ¶ 11 n.6, 445 P.3d 955. This would be the case, for example, when the different possible rationales for the decision are subject to different standards of review on appeal. *Id.* ¶¶ 5–6, 11 n.6.

---

(…continued)

Ostler also claims that "the trial court erroneously denied the motion for leave to file an amended complaint by considering an untimely opposition and not letting Mr. Ostler reply." (Quotation simplified.) Because we reverse, we need not consider this alternative argument. *See McNair v. State*, 2014 UT App 127, ¶ 6 n.5, 328 P.3d 874.

¶24   This is so here. When a district court denies a motion to amend, we ordinarily review that denial under an abuse of discretion standard, but if the denial is based on "the purported futility of the amendment," we instead review for correctness. *Haik v. Jones*, 2018 UT 39, ¶¶ 11, 16, 427 P.3d 1155. As noted, the Defendants here gave the district court three rationales for denying the motion to amend. One of them was futility, which would be subject to a different standard of review on appeal than the others.

¶25   Nevertheless, it is settled that we "treat a district court's order as an abuse of discretion when the district court fails to articulate its reasoning for denying leave to amend, unless the court's reasoning is apparent from the record." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 19, 243 P.3d 1275. In the ordinary case, the district court's silence would thus require us to determine whether we can ascertain the basis for its decision from the record.

¶26   We need not make that determination in this case, however, because the Defendants have advanced only one rationale for the district court's ruling in their appellate brief: futility. As noted, the Defendants did offer two other rationales to the district court below, but they did not mention those in their brief. Instead, their sole argument to us was that "Ostler's proposed amendment was futile and would not survive a motion to dismiss."

¶27   At oral argument, the Defendants nevertheless suggested that we could still affirm based on the other two rationales. But our briefing rules require a party to "explain, with reasoned analysis supported by citations to legal authority and the record, why [it] should prevail on appeal." Utah R. App. P. 24(a)(8), (b)(3). We accordingly retain "discretion to not address" an argument that is inadequately briefed. *Broderick v. Apartment Mgmt. Consultants, L.L.C.*, 2012 UT 17, ¶ 11, 279 P.3d 391 (quotation simplified).

¶28 Moreover, the two non-briefed rationales would be subject to different standards of review if we addressed them. And they also implicate distinct legal rules and lines of authority that the Defendants have not provided us in their brief. Given all this, and given the Defendants' decision to focus on just one of those rationales in their brief, we limit our review accordingly.

¶29 The sole question before us, then, is whether Ostler's motion to amend would have been futile.

¶30 "It is well settled that a court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 139, 82 P.3d 1076 (quotation simplified). And a proposed amendment will not withstand a motion to dismiss if it fails to "allege facts sufficient to satisfy each element of a claim." *Harvey v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 60, 416 P.3d 401; *see also First Interstate Fin. LLC v. Savage*, 2020 UT App 1, ¶ 10, 458 P.3d 1161.

¶31 When a case turns on the interpretation of a contract, an amended complaint will withstand a motion to dismiss if the operative contract language is ambiguous. *See Haynes v. Department of Public Safety*, 2020 UT App 19, ¶ 11, 460 P.3d 565. The reason for this is that, when "an ambiguity exists, the intent of the parties becomes a question of fact upon which parol evidence of the parties' intentions should be admitted." *E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 21, 336 P.3d 1077 (quotation simplified).

¶32 "Whether contract language is ambiguous is a question of law." *Dixon v. Pro Image Inc.*, 1999 UT 89, ¶ 14, 987 P.2d 48. And a contract "is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (quotation simplified). Thus, a court cannot

conclude that a motion to amend would be futile based on a contract's language if that language is susceptible to multiple reasonable interpretations. *See Jensen*, 2003 UT 51, ¶¶ 139–42; *Haynes*, 2020 UT App 19, ¶ 11.

¶33    Again, the language at issue here is the Contact Provision, which applied if "the Defendants and/or the State of Utah are contacted by any potential or prospective employers of Ostler, or any other third party concerning prospective employment." So the question before us is whether that provision is susceptible to multiple reasonable interpretations as to its application to prospective State employers. If it is, then Ostler's motion to amend was not futile.

¶34    The parties obviously have different answers to that question.

¶35    From Ostler's perspective, if the Contact Provision only applied to non-State employers, then the phrase "*any* potential or prospective employers" would be rendered meaningless. (Emphasis added.) After all, the word "any" commonly means "one or some indiscriminately of whatever kind," so in his view, the Contact Provision broadly applies to "potential or prospective employers" "indiscriminately of whatever kind." *See Any*, Merriam-Webster, https://www.merriam-webster.com/dicti onary/any [https://perma.cc/H4ZB-XYZU](definition 1).

¶36    Moreover, the phrase "any potential or prospective employers" is separated from the phrase "any other third party" by the disjunctive "or." Because "or" is commonly "used as a function word to indicate an alternative," Ostler suggests that "any other third party" could plausibly refer to other non-employer entities like investigators and headhunters, for example, who might contact the Defendants. *See Or*, Merriam-Webster, https://www.merriam-webster.com/dictionary/or [https ://perma.cc/6T36-M9QV] (definition 1).

¶37 We conclude that this is a reasonable interpretation of this provision—i.e., that, on its face, "any potential or prospective employers" could mean "*any* potential or prospective employers," including State employers. And the phrase "or any other third party" could be separately referring to those who are not "potential or prospective employers" but nonetheless might still contact the Defendants about Ostler.

¶38 Because Ostler's interpretation is reasonable, we must decide if the Defendants' interpretation forecloses Ostler's interpretation.

¶39 According to the Defendants, the phrase "potential or prospective employers" is "illustrative of, and limited by, the catchall phrase" "any other third party." So according to the Defendants, State employers do not qualify as "potential or prospective employers" because they are not third parties.

¶40 To support this interpretation, the Defendants rely on "reverse ejusdem generis." Reverse ejusdem generis is a method of interpretation that some courts have recognized as a canon of construction. *See, e.g., United States v. Williams-Davis*, 90 F.3d 490, 508–09 (D.C. Cir. 1996); *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's, London*, 179 S.W.3d 619, 624–25 (Tex. App. 2005); *see generally* Jay Wexler, *Fun with Reverse Ejusdem Generis*, 105 Minn. L. Rev. 1 (2020). With reverse ejusdem generis, a "general term reflects back on the more specific" term. *Williams-Davis*, 90 F.3d at 509. For example, "the phrase 'A, B, or any other C' indicates that A is a subset of C." *Id.* If applied to the Contact Provision, reverse ejusdem generis would therefore mean that "any potential or prospective employers" is a subset of "any other third party"—i.e., the Contact Provision applies only if Ostler's "potential or prospective" employer is also a "third party."

¶41 We conclude that this is also a reasonable interpretation of the Contact Provision. The word "other" in "any other third party" could indeed limit "any potential or prospective

employers" to third parties who are not State employers. *See Other*, Merriam-Webster, https://www.merriam-webster.com/dictionary/other [https://perma.cc/9XNH-FB28] (definition 1a) (defining "other" as "being the one (as of two or more) remaining or not included").

¶42 But the problem for the Defendants is that their reasonable interpretation does not foreclose Ostler's reasonable interpretation. Because no Utah appellate decision has yet recognized reverse ejusdem generis as a canon of construction, we question the fairness of allowing it to dictate, as a matter of law, the outcome of this contract dispute. *Cf. Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465 ("Canons of construction . . . are not formulaic, dispositive indicators of statutory meaning. They are merely tools that guide our construction of statutes in accordance with common, ordinary usage and understanding of language . . . . Such tools must be understood as one of several contextual indicators of statutory meaning.").

¶43 Moreover, one of the justifications for the canons of construction is that they are so entrenched in our legal system that we can expect lawyers to have them in mind while drafting. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 51 (2012) ("When it is widely understood in the legal community that, for example, a word used repeatedly in a document will be taken to have the same meaning throughout, . . . you can expect those who prepare legal documents competently to draft them accordingly.").

¶44 But the term "reverse ejusdem generis" was not even coined until 1996. *See Williams-Davis*, 90 F.3d at 509. That is the same year that the parties entered into the release agreement, so we cannot necessarily expect that they drafted the release agreement with this particular canon in mind. We also note that canons of construction are most typically used to resolve ambiguity, not to suggest that it never existed at all. *See Thayer v.*

*Washington County School Dist.*, 2012 UT 31, ¶ 37, 285 P.3d 1142 (Lee, J., dissenting) ("Canons of construction are not universal rules of grammar or syntax. They are rules of thumb that provide potentially useful cues for resolving ambiguity in written text."); *see also Brady v. Park*, 2019 UT 16, ¶ 131, 445 P.3d 395 (Lee, A.C.J., concurring in part and dissenting in part) (explaining that a "judicial determination of ambiguity opens the door to extrinsic evidence" like "the possible application of a canon of construction"); *Graves v. North E. Services, Inc.*, 2015 UT 28, ¶ 55, 345 P.3d 619 ("But [ejusdem generis] comes into play only in cases of ambiguity as to the general term.").

¶45 What's more, some courts have rejected reasoning like the Defendants'. The United States Supreme Court's decision in *United States v. Palmer*, 16 U.S. 610 (1818), is illustrative. There, the Supreme Court interpreted a statute that provided that any person who committed "upon the high seas . . . murder or robbery, or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death" could be convicted, in turn, of piracy and thereby sentenced to death. *Id.* at 626. In the case at issue, some mariners had committed robbery at sea and argued on appeal that they could not be convicted of piracy because robbery committed on land was not "punishable with death." *Id.* at 627. In other words, they argued that the phrase "any other offence, which . . . would . . . be punishable with death" was a catchall phrase that limited the meaning of "robbery," meaning that the mariners could only be convicted of piracy if robbery on land was punishable by death. *Id.* at 626–27. In this sense, their argument relied on the same interpretive principle that we would now refer to as reverse ejusdem generis.

¶46 The Supreme Court acknowledged that the mariners' interpretation was "entitled to great respect on every account" because it was the only way to give the word "other" any meaning. *Id.* at 628. But the Court nevertheless concluded that "robbery" was not limited by the phrase that followed. *Id.* at 629.

Because Congress clearly specified "murder or robbery," the Court chose to not read the statute in such a way that would exclude those crimes. *Id.* at 628–29.

¶47 The analysis in *Palmer* thus suggests that, like the other canons, reverse ejusdem generis can be a useful tool—but it is not an inexorable command. *See also Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) ("Canons are not mandatory rules. They are guides that need not be conclusive." (quotation simplified)). So here, while the Defendants' application of reverse ejusdem generis to the Contact Provision has some persuasive force, it's not enough to demonstrate that Ostler's contrary interpretation is not a reasonable one too. As a result, we conclude that the motion to amend was not futile.[4]

---

4. In their brief, the Defendants also argue that Ostler's amended complaint was futile because it "fails to sufficiently allege how the State of Utah—in contravention of the obligation in Paragraph 10 of the Agreement—failed to comply with the laws, rules, and regulations concerning the disclosure of information pertaining to Ostler." But "pleadings are 'sufficient' where they give fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved." *Southern Utah Wilderness All. v. San Juan County Comm'n*, 2021 UT 6, ¶ 40, 484 P.3d 1160 (quotation simplified); *see also* Utah R. Civ. P. 8. This is a "liberal standard." *Harvey v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 24, 416 P.3d 401 (quotation simplified). The Defendants have not persuaded us that Ostler's amended complaint fails this liberal standard, because Ostler did allege that the Defendants "disclosed and released false, fraudulent, defamatory, or otherwise incorrect information about Mr. Ostler's prior history with the State of Utah to the Utah Department of Transportation[, Adult Probation and Parole, and Salt Lake Community College] contrary to DHRM Human Resource management rules."

CONCLUSION

¶48 Because both sides have put forth reasonable interpretations of the Contact Provision, that provision is ambiguous. *See Dixon v. Pro Image Inc.*, 1999 UT 89, ¶ 14, 987 P.2d 48. Because it's ambiguous, Ostler's amended complaint would not be subject to dismissal as a matter of law and his motion to amend therefore would not have been futile. *See Haynes v. Department of Public Safety*, 2020 UT App 19, ¶ 11, 460 P.3d 565. Because futility is the only justification for the district court's ruling advanced by the Defendants in their brief, and because that ruling cannot stand, we reverse. *See Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶¶ 139–42, 82 P.3d 1076.

———————