**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CURT A. MARCANTEL, an individual,

    Plaintiff - Appellant,

v.

MICHAEL AND SONJA SALTMAN
FAMILY TRUST; MICHAEL A.
SALTMAN, an individual; SONJA
SALTMAN, an individual,

    Defendants - Appellees.

No. 19-4055

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CV-00250-DBP)**
_____

Paxton R. Guymon (Lauren Parry Johnson with him on the briefs), of York Howell &
Guymon, South Jordan, Utah, for Plaintiff-Appellant.

Eric P. Lee (Justin J. Keys with him on the briefs), of Hoggan Lee Hutchinson, Park City,
Utah, for Defendants-Appellees.
_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

    In 2015, Michael and Sonja Saltman sold a vacant lot in Park City, Utah, to

Curt Marcantel. Eager to develop the property or otherwise turn a profit, Marcantel

pushed to close the deal quickly. But at the time of the sale, the Saltmans knew something that Marcantel didn't: a ten-foot wide sewer easement (including a sewer pipe within it) ran under a portion of the property, rendering infeasible the most lucrative development designs. Worse still, the Saltmans and the owner before them had both lobbied the city to relocate the sewer easement, all to no avail.

The Saltmans told Marcantel none of this. Nor did the title company that Marcantel hired discover the easement. And that title company wasn't the first or the last to miss the easement. Because of an indexing error by the county recorder, at least three different title companies on four separate occasions failed to find and note the sewer easement on the property. Marcantel first heard about the easement when his prospective buyer alerted him to it; that buyer fortuitously learned of the easement from a neighboring property owner. The prospective buyer then balked at Marcantel's asking price. Marcantel eventually sold the lot at a significant loss.

Marcantel sued the Saltmans for, among other things, fraudulent nondisclosure and breach of the parties' real estate purchase contract. He argued that the Saltmans' mum's-the-word approach breached their contractual and common-law duties to disclose the easement. For their part, the Saltmans claimed they had assumed Marcantel knew about the easement, and in any event, Marcantel had constructive notice of the easement because it was publicly recorded. Adopting almost verbatim the Saltmans' proposed order, the district court granted the Saltmans summary judgment on all Marcantel's claims.

On appeal, Marcantel argues that the district court repeatedly misapplied Utah law and disregarded summary-judgment procedure that required it to draw inferences in Marcantel's favor. We agree. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further consideration consistent with this opinion.

## BACKGROUND

### I.     Factual Background

In early 2007, Michael and Sonja Saltman purchased a mostly vacant lot (the "Property") in Park City, Utah, hoping to develop it.[1] They bought the Property from Old Town Partners, LLC ("Old Town") through the Michael and Sonja Saltman Family Trust (the "Trust") for $1,700,000. Though the Saltmans' title commitment and title policy hadn't identified any encumbrances, Old Town informed them prior to closing that it had been working with Park City officials to try to relocate a ten-foot wide sewer line easement (the "Easement") that crossed under the Property.

In May 1989, the Summit County Recorder's Office recorded a document titled "Grant of Easement," naming Verna Thorn as Grantor and the Snyderville Basin Sewer Improvement District as Grantee. The Grant of Easement contained a metes-and-bounds legal description, rather than a reference to the parcel or tax serial

---

[1] Not long after the Saltmans purchased the property, Park City approved their application to deem the single existing structure on the Property "non-historic." The Saltmans then had the structure demolished.

number.[2] Unfortunately, the county recorder indexed the recorded Easement incorrectly.[3] The abstracts mistakenly recorded the Easement on the wrong section of the relevant city block.[4]

As part of Old Town's efforts to relocate the Easement, it commissioned an existing-conditions survey (the "Survey") of the Property (depicted below with the Easement highlighted in yellow):

---

[2] The Easement was described as follows: "A 10.00 foot wide sanitary sewer easement lying 5.00 feet on each side of the following described centerline: beginning at a point on the north line of Grantor's property and south line of 11th Street, also known as Crescent Street, said point being . . . 2883.76 feet along the section line and south 1318.04 feet from the southwest corner of section 9, Township 2 south, range 4 east S.L.B.&M., said point also being . . . 141.32 feet and . . . 15.05 feet from the city monument at the intersection of 11th Street and Park Avenue, and running thence . . . 60.0 feet more or less to the south line of Grantor's property and terminating." App. vol. 1 at 51.

[3] In addition to maintaining "an entry record," Utah Code § 17-21-6(1)(a), Utah law requires county recorders to "keep a tract index" that, among other things, describes "the kind of instrument [recorded], the time of recording, and the book and page and entry number[,]" *id.* § 17-21-6(1)(f). This process by which the county recorder copies recorded instruments into the tract index is known as "abstraction." *See id.* § 17-21-6(3)(b) (requiring that "[a] recorder shall abstract an instrument in the tract index" unless the instrument is deficient in one of the ways the statute specifies). Utah law requires a tract index to be kept "so that it shows a true chain of title to each tract or parcel, *together with each encumbrance on the tract or parcel*, according to the records of the office." *Id.* § 17-21-6(3)(a) (emphasis added). The purpose of the tract index is to make it easier for the public to find recorded instruments. *See Boyer v. Pahvant Mercantile & Inv. Co.*, 287 P. 188, 191 (Utah 1930) (noting that "the purpose" of the tract index is to "afford[] a correct and easy reference to the books of record" and "is designed . . . for the convenience of those searching the records" (quotation marks and citation omitted)).

[4] As discussed below, this error caused several title companies to miss the Easement in their title reports. The Easement wasn't identified despite title searches by professional title agents when Old Town, the Saltmans, or Marcantel purchased the Property, nor when Marcantel was in the process of selling the property.



App. vol. 8 at 2221–22.

Like Old Town before them, the Saltmans wanted to develop the Property. So they engaged Elliot Workgroup Associates ("Elliot Workgroup") to prepare needed predevelopment applications to submit to Park City. Specifically, they hoped to subdivide the Property into three lots to build a residential property on each as shown below (the Easement is again highlighted in yellow).

5



*Id.* at 2223.

Elliot Workgroup submitted those applications to Park City on April 30, 2007. At some point, Elliot Workgroup had acquired the Survey from Old Town and included it in the applications. The Saltmans contemporaneously applied to the sewer district to have the Easement relocated. Mr. Saltman signed the applications, each of which included the Survey. The applications to Park City also contained an "Acknowledgement of Responsibility" by which Mr. Saltman verified that he understood the application instructions and that the documents submitted were "true and correct." *Id.* vol. 4 at 1056, 1081, 1108, 1134. The sewer district never approved the Saltmans' plan to relocate the Easement. Ultimately, the Saltmans didn't pursue the development plans contemplated in their applications and abandoned all plans to develop the Property after the 2007 financial crisis and ensuing recession.

In 2014, under what his daughter described as "financial distress," Mr. Saltman decided to sell the Property to pay off a $1,461,000 loan. *Id.* vol. 2 at

6

539:18–540:2; *id.* vol. 4 at 890–91. In early 2015, the Saltmans listed the Property for sale. Soon after, the Saltmans entered into a Real Estate Purchase Contract ("REPC") for the Property's sale with Lakeland Homes, Inc. (through Marcantel, its president). Marcantel agreed to buy the Property for $1,775,000.

Three provisions of the REPC are relevant here. First, REPC Section 10.2 provided:

> Seller agrees to: (a) disclose in writing to Buyer defects in the Property known to Seller that materially affect the value of the Property that cannot be discovered by a reasonable inspection by an ordinary prudent Buyer[.]

*Id.* vol. 2 at 407. Second, REPC Section 7 ("Seller Disclosures") stated:

> No later than the Seller Disclosure Deadline . . . , Seller shall provide to Buyer the following documents in hard copy or electronic format which are collectively referred to as the "Seller Disclosures": . . . (h) Other (specify): Survey if one has been done.

*Id.* at 405–06. Third, Section 6(D) of the "Seller's Property Condition Disclosure" (incorporated into the REPC by Sections 7(a) and 10.2) included the following:

> Are you aware of any survey(s) that have been prepared for the Property or any adjoining property or properties? If 'Yes,' please provide a copy of any such survey(s) in your possession.

*Id.* vol. 4 at 877. The Saltmans marked "no," and they never provided Marcantel with a copy of the Survey. *Id.* at 877, 897.

At no time did the Saltmans tell Marcantel about the Easement or their efforts to relocate it. Although Marcantel commissioned a title search through Coalition Title and Stewart Title, neither company identified the Easement. So when Marcantel closed on the Property, he didn't know about the Easement.

In fall 2015, Marcantel contracted to sell the Property to Joe Kelly for $1,995,000—what would have been a profit of over $200,000. U.S. Title prepared the title commitment for Kelly, and it too failed to identify the Easement. But while at the Property one day, Kelly learned of the Easement when a "purported neighbor" commented to him about it.[5] *Id.* at 898. Kelly cancelled the purchase contract and made two reduced offers of $1,250,000 and $1,400,000, both of which Marcantel rejected. In March 2018, Marcantel finally sold the Property to a different buyer for $1,450,000, suffering a loss of over $300,000.

## II. Procedural History

In March 2016, Marcantel sued Stewart Title Guaranty Co., Coalition Title, Michael Saltman, Sonja Saltman, and the Trust in the United States District Court for the District of Utah. The case was assigned to a magistrate judge and all parties consented.

In March 2018, the district court granted summary judgment to Coalition Title and dismissed it from the case. A few months later, Marcantel stipulated to dismissing Stewart Title from the case after it settled with him for $272,500.

That left three defendants—the Trust and Michael and Sonja Saltman. Marcantel asserted claims for fraudulent nondisclosure and fraudulent misrepresentation against the Saltmans, claiming they had breached their duty to disclose the Easement and Survey and had misrepresented the Property's

---

[5] The record tells us little about the circumstances or content of this conversation.

development potential. He also brought claims for breach of contract and breach of the implied covenant of good faith and fair dealing against the Trust, claiming it had similarly breached its obligations under the REPC by failing to disclose the Easement and to produce the Survey.

At the close of discovery, the Saltmans and the Trust jointly moved for summary judgment on all Marcantel's claims. Because the Easement was recorded, the Saltmans argued that Marcantel had constructive notice of it, barring his claim for fraudulent nondisclosure. They also maintained that they didn't know that Marcantel was unaware of the Easement and didn't possess the Survey (or even know that it existed until this litigation). Marcantel moved for partial summary judgment on his claims for breach of contract and fraudulent nondisclosure. Marcantel argued that the Trust and the Saltmans "concealed and failed to disclose the Sewer Easement" and did not provide him a copy of the Survey as required by the REPC. *Id.* at 882. He maintained that he wouldn't have purchased the Property had he known about the Easement and that he learned of it only when the sale to Kelly fell through.

In February 2019, the district court held a hearing on the parties' cross-motions for summary judgment during which it asked the parties numerous questions regarding the fraud and contract claims. At the end of the hearing, the court shared its preliminary conclusions, explaining that it intended to grant the Saltmans' motion for summary judgment and to deny Marcantel's partial motion for summary judgment. Additionally, the court asked the Saltmans to prepare a proposed order (the "Proposed Order") consistent with its preliminary ruling.

9

Marcantel objected to the Saltmans' Proposed Order as "inconsistent with the Court's findings of fact, conclusions of law and oral rulings announced at the hearing[.]" Appellant's Principal Br., Ex. 4 at 1. He requested that the court edit the Proposed Order "so that it is consistent with the oral findings and rulings." *Id.* at 2. Although the district court modified the "undisputed facts" section of its memorandum decision and order ("Memorandum Decision"), it left the remainder unchanged. Appellant's Principal Br. at 51. In adopting the Proposed Order, the court noted Marcantel's objection but determined that it "accurately reflects the decision of the court." App. vol. 8 at 2220 n.3.

On March 19, 2019, the court entered final judgment and dismissed the case with prejudice. Marcantel timely appealed from the final judgment and Memorandum Decision. Marcantel appeals only the district court's grant of summary judgment for the Saltmans on his fraudulent-nondisclosure claim and its grant of summary judgment for the Trust on his breach-of-contract claim.

## DISCUSSION

Marcantel argues that the district court committed numerous errors—both procedural and substantive—in granting the Saltmans' motion for summary judgment. We address Marcantel's arguments in the following order. First, we consider whether the district court improperly granted summary judgment on Marcantel's fraudulent-nondisclosure claim. Second, we consider whether the district court improperly granted summary judgment on Marcantel's breach-of-contract

10

claim. And third, we consider whether the district court reversibly erred by adopting almost verbatim the Saltmans' Proposed Order.[6]

## I.      Standard of Review[7]

"We review summary judgment de novo, applying the same legal standard as the district court." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (citation omitted). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When applying this standard, we review the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Gutierrez*, 841 F.3d at 900 (quoting *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012)).

In moving for summary judgment, the Saltmans asserted that Marcantel "fail[ed] to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This required Marcantel to

---

[6] Marcantel raises as a separate issue a claim that the district court erred by failing to draw inferences in his favor. But "[b]ecause our review is de novo, we need not separately address arguments that the district court erred by viewing evidence in the light most favorable to [the Saltmans] and by treating disputed issues of fact as undisputed." *Simmons v. Sykes Enter., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (citation omitted).

[7] We address here only our standard of review governing summary judgment orders. We consider below what standard of review applies to Marcantel's argument that the district court erred by adopting in its entirety the legal analysis contained in the Saltmans' Proposed Order.

"designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

Further, we review the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Here, that burden is clear and convincing evidence on Marcantel's fraudulent-nondisclosure claim and a preponderance of the evidence on his breach-of-contract claims. *See Anderson v. Kriser*, 266 P.3d 819, 823 (Utah 2011) (fraudulent nondisclosure); *Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 670 (Utah 1982) (breach of contract).

## II.    Fraudulent Nondisclosure

This appeal requires us to confront several nuances in Utah's fraudulent nondisclosure law as it relates to real-estate transactions. "Because this is a diversity action, we apply the substantive law of the forum state." *MTI, Inc. v. Emp'rs Ins. Co. of Wausau*, 913 F.3d 1245, 1248–49 (10th Cir. 2019) (internal quotation marks and citation omitted). When interpreting Utah's law, we "must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007)). Decisions of a state's intermediate court of appeals may also aid us in this process. *See Stickley*, 505 F.3d at 1077 ("The decision of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that

12

the highest court of the state would decide otherwise." (internal quotation marks and citation omitted)). And "[a] federal court performing an *Erie* analysis may also consider 'appellate decisions in other states with similar legal principles . . . and the general weight and trend of authority in the relevant area of law.'" *Amparan*, 882 F.3d at 948 (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007)).

To prevail on a claim for fraudulent nondisclosure under Utah law, the plaintiff "must prove by clear and convincing evidence that (1) the defendant had a legal *duty* to communicate information, (2) the defendant *knew* of the information he failed to disclose, and (3) the nondisclosed information was *material*." *Anderson*, 266 P.3d at 823 (internal quotation marks and citation omitted). On the first element, Utah common law imposes on sellers of real property "a duty to disclose material known defects that cannot be discovered by a reasonable inspection by an ordinary prudent buyer."[8] *Hermansen v. Tasulis*, 48 P.3d 235, 242 (Utah 2002) (citing *Mitchell v. Christensen*, 31 P.3d 572, 575 (Utah 2001)). As to the second element, the

---

[8] Utah is among the minority of states that hasn't codified the common-law disclosure duty. *See* 10A Real Estate Brokerage Law and Practice § 15.01 (2020) ("[A] majority of states and the District of Columbia have adopted laws or regulations expressly requiring the seller to disclose specified information about the features or condition of the property."). The only disclosure duty Utah imposes by statute relates to properties "contaminated by methamphetamines." *See id.* at Appendix 3A-1 (Utah); Utah Code § 57-27-201.

plaintiff must show that the defendant possessed actual knowledge of the material defect that the defendant allegedly failed to disclose. *Anderson*, 266 P.3d at 825.

Before reaching those elements, however, the Saltmans urge us to find that, as a threshold matter, the Easement isn't a "defect" under Utah common law. We thus begin with that question.

### A.     The Easement Constitutes a Defect

The Saltmans argue that we needn't examine the merits of Marcantel's fraudulent-nondisclosure claim because we should find in the first instance that the Easement isn't a defect. They assert that "[i]n the nondisclosure context, defects are tangible things or conditions," which necessarily excludes easements. Appellees' Br. at 39. Marcantel counters that the "sewer pipeline . . . installed within the Easement" constitutes "a physical, tangible intrusion in the subsurface of the Property." Reply Br. at 1–2. The district court sided with Marcantel. Although the district court acknowledged that not every easement qualifies as a "defect," it ruled that the physical intrusion of the sewer pipe on the Property "was a defect" "[u]nder the specific facts and circumstances of this case." App. vol. 8 at 2261. We agree.

Though the parties agree that Utah common law governs this claim, neither side identified controlling authority from Utah's highest courts resolving—or even addressing—this issue. Lacking any binding decisions from the Utah Supreme Court, we must predict how that court would rule. *See Amparan*, 882 F.3d at 947. That is, we must decide whether the Utah Supreme Court would classify the sewer pipe

14

running under the Property as a defect that could be subject to a real-property seller's disclosure obligations. We conclude that it would.

To start, we must define "defect." But the REPC offers no definition, nor does any relevant statute set out its meaning. Further, Utah's courts haven't yet explored the term's scope. So we follow the parties' lead—and the Utah Supreme Court's preferred approach—by consulting dictionary definitions as a starting point. *See State v. Bagnes*, 322 P.3d 719, 723 (Utah 2014) ("The term 'lewdness' is not defined by statute. We must accordingly look elsewhere to derive . . . the ordinary meaning of the word . . . . A starting point for our assessment of ordinary meaning is the dictionary."); *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001–02 (Utah 2016) (explaining that "when interpreting a contract, we generally give each term its plain and ordinary meaning" and using Black's Law Dictionary to determine the ordinary meaning of "shall"); *see also South Ridge Homeowners' Ass'n v. Brown*, 226 P.3d 758, 759 (Utah Ct. App. 2010) ("In interpreting contracts, the ordinary and usual meaning of the words used is given effect, which ordinary meaning is often best determined through standard, non-legal dictionaries." (internal quotation marks, ellipsis, and citation omitted)).

Black's Law Dictionary defines "defect" as "[a]n imperfection or shortcoming, esp. in a part that is essential to the operation or safety of a product." *Defect*, *Black's Law Dictionary* (11th ed. 2019). Merriam-Webster defines "defect" similarly as "an imperfection or abnormality that impairs quality, function, or utility." *Defect*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defect (last visited

15

Oct. 5, 2020). Thus, as relevant here, a defect is any condition that renders a property imperfect or impairs its quality, function, or utility.

Under this broad formulation, a defect encompasses a host of property imperfections from the nearly unnoticeable to the obvious. The dictionary definitions would include, for example, conditions that almost every homeowner has faced: leaky faucets and clogged drains, linoleum cracks and warped hardwood, blemished walls and doors that stick. Each of these conditions, though perhaps benign, in some sense impairs a property's quality, function, and utility.

But broken light switches and creaky stairwells won't trigger common-law disclosure obligations. Notwithstanding the broad definition of defect, we aren't expanding what defects a seller must disclose. That's because Utah law requires sellers to disclose only defects that (1) they have actual knowledge of, (2) are material, (3) and aren't discoverable upon a reasonable inspection. *See Hermansen*, 48 P.3d at 242. Minor or obvious defects won't meet that test.

Utah's fraudulent-nondisclosure caselaw supports defining "defect" broadly. Indeed, in considering home defects, the Utah Supreme Court has taken an expansive view of a seller's disclosure obligations. The court first articulated the elements a plaintiff must establish to prevail on a fraudulent-nondisclosure claim involving home defects in *Mitchell v. Christensen*, 31 P.3d 572, 574 (Utah 2001). There, after purchasing a home from the defendants, the plaintiff discovered several leaks in the swimming pool's piping and body. *Id.* at 573. Relying in part on the doctrine of caveat emptor, the lower courts granted the defendants summary judgment, ruling

16

that the plaintiff had an opportunity to inspect the home before closing and that she should have sought an "in-depth inspection" of the pool. *Id.* at 574. The Utah Supreme Court reversed. *Id.* at 576.The court refused to "force purchasers to hire numerous home inspectors to search for hidden defects." *Id.* at 575. Instead, the court cabined the doctrine of caveat emptor "where a defect is not discoverable by reasonable care." *Id.* at 574 (internal quotation marks and citation omitted). And "in determining what constitutes reasonable care in the discovery of defects, the proper standard is whether the defect would be apparent to ordinary prudent persons with like experience, not to persons with specialized knowledge in the field of construction or real estate." *Id.* at 575.

A year later, the Utah Supreme Court extended the disclosure obligation to licensed real estate professionals and reversed a lower court's grant of summary judgment to the defendant. *See Hermansen*, 48 P.3d at 241. The court also defined "materiality" broadly to include anything "which a buyer or seller of ordinary intelligence and prudence would think to be of . . . importance in determining whether to buy or sell."[9] *Id.* at 242 (internal quotation marks and citations omitted).

Then in *Yazd v. Woodside Homes Corp.*, 143 P.3d 283 (Utah 2006), the Utah Supreme Court further expanded defendants' disclosure obligations in two ways.

---

[9] The full quote defined materiality as anything "which a buyer or seller of ordinary intelligence and prudence would think to be of *some* importance in determining whether to buy or sell." *Id.* at 242 (emphasis added) (quotation omitted). In a later decision, the Utah Supreme Court deleted the word "some" to "clarify the definition of materiality as the term is used as an element of . . . fraudulent nondisclosure." *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 289 (Utah 2006).

17

First, it extended the disclosure obligation to builder-contractors. *Id.* at 287 ("Here, it is Woodside's status as builder-contractor that gives rise to its legal duty to the home buyers."). Second, the court ruled that a defendant may be required to disclose known material defects affecting the plaintiff's property even when those defects fall outside the boundaries of the plaintiff's property. *Id.* at 288. In *Yazd*, the defendant argued that a report detailing unstable soil conditions in a property adjacent to the plaintiff's property couldn't be "material" because it described soil conditions on land other than the plaintiff's. *Id.* The court disagreed, declining "to categorically deem immaterial all information concerning property not owned by the party affected by unsuitable soil conditions." *Id.*

From these decisions, we understand the Utah Supreme Court to have expressed a clear preference for holding sellers of real property accountable when they fail to disclose known material defects.

Against this backdrop, we consider whether the Easement qualifies as an imperfection or abnormality that impairs the quality, function, or utility of the Property. We have no doubt that it does. Because developers couldn't build on top of the sewer easement, it significantly limited the available options to develop the

18

Property. Consider the Saltmans' preferred development plan (the highlighted

segment depicts the Easement):



In this iteration, the Property would be divided into three lots, with a residential

home built on each lot. But this three-lot subdivision was feasible only by relocating

the sewer easement to the perimeter of the property. The quality, function, and utility

of a pre-development property is determined in large measure by the freedom with

which a developer can develop the property. Indeed, the Saltmans marketed the

Property this way: "Most development opportunities in old town come with major

constraints, but this parcel is vacant and ready for your ideas . . . . [A]t 6900 SF this

parcel may be able to accommodate up to 5 residential units." App. vol. 8 at 2224.

But the Easement significantly inhibited development of the Property by limiting

available design concepts. In this way, the Easement constitutes an imperfection that impaired the quality, function, and utility of the Property.

None of the Saltmans' arguments persuade us otherwise. Contrary to the Saltmans' contention, we wouldn't be the first court to find that a sewer easement may constitute a defect. *See Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45–46 (S.C. Ct. App. 2010), *aff'd*, 719 S.E.2d 656 (2011) (affirming lower court's ruling that defendant was liable for fraud for failing to disclose an underground drainage easement even though the easement was publicly recorded); *Fancher v. Lawrence*, No. 1962, 1992 WL 42793, at *6–7 (Ohio Ct. App. Mar. 6, 1992) (upholding lower court's finding that "the existence of a main sewer line [easement] buried under a portion o[f] the premises" constituted a "substantial latent defect[] in the property" that was known to the defendants but wasn't discoverable by reasonable inspection).

To be sure, some courts considering similar claims have concluded that a seller's failure to disclose an easement didn't give rise to a claim for fraud. *See, e.g.*, *Schottland v. Brown Harris Stevens Brooklyn, LLC*, 968 N.Y.S.2d 90, 92 (N.Y. App. Div. 2013); *Stevenson v. Baum*, 75 Cal. Rptr. 2d 904, 907–08 (Cal. Ct. App. 1998); *Bache v. Owens*, 929 P.2d 217, 222 (Mont. 1996). But none of those courts considered, let alone held, that the relevant easement wasn't a defect. Rather, those cases concluded that liability didn't attach because the easements *were discoverable*, and a seller needn't disclose known defects if an ordinary prudent buyer could discover them upon reasonable inspection. *See Schottland*, 968 N.Y.S.2d at 92;

20

*Stevenson*, 75 Cal. Rptr. 2d at 907; *Bache*, 929 P.2d at 221–22. Those decisions therefore have little bearing on the issue before us.

And even if we agreed with the Saltmans that Utah law limits defects to tangible imperfections,[10] the sewer pipe fits under that rubric. The Saltmans assert that "[i]n the nondisclosure context, defects are tangible . . . conditions like the leaks in the swimming pool in *Mitchell*, the cracks in the foundation in *Shiozawa v. Duke*, and the unstable soil under the foundation in *Hermansen v. Tasulis*." Appellees' Br. at 39 (citations omitted). A tangible sewer pipe runs beneath the Property. We see no reason why that pipe is less of a physical defect than the cracks in Mitchell's swimming pool or Hermansen's unstable soil.

Still, the Saltmans insist that the Easement is more akin to "a height limitation[] and other zoning regulations" than to "an imperfection or shortcoming in the Property itself." *Id.* According to the Saltmans, if we conclude that the sewer pipe installed within the Easement is a defect, "every zoning regulation governing where and how much building can occur (*e.g.*, setback requirements and height limits) is a defect." *Id.* at 40. But, as just discussed, the physical component of the Easement— the sewer pipe—distinguishes it from the purely legal restrictions the Saltmans cite.

_____

[10] Although Utah courts appear not to have considered the issue, many states require sellers of real property to disclose intangible (sometimes dubbed "psychological") defects. *See, e.g., Van Camp v. Bradford*, 623 N.E.2d 731, 736 (Ohio Com. Pleas 1993) (holding that "[t]he stigma" arising from a recent, unsolved rape that occurred in the home constituted an "intangible . . . defect" the seller was required to disclose); *Stambovsky v. Ackley*, 169 A.D.2d 254, 257–59 (N.Y. App. Div. 1991) (holding that caveat emptor didn't excuse a seller's failure to disclose that the home at issue was allegedly haunted).

21

Besides, even if under our definition those zoning regulations could also be considered "defects," (a proposition we find doubtful) they would rarely, if ever, trigger a seller's disclosure obligations because, ordinarily, they would be readily discoverable.

In sum, the ordinary meaning of "defect" encompasses the underground sewer pipe as a material imperfection in the Property, that is, one that indisputably impaired its quality, function, and utility. We thus proceed to consider the merits of Marcantel's fraudulent nondisclosure claim.

### B. The District Court Erred in Concluding That Marcantel's Fraudulent Nondisclosure Claim Failed as a Matter of Law

On appeal, the parties don't dispute the second or third elements of Marcantel's fraudulent-nondisclosure claim; the Saltmans acknowledge that they possessed actual knowledge of the Easement, and the district court didn't reach the materiality question. Rather, Marcantel challenges the district court's ruling that the Saltmans owed Marcantel no duty to disclose the Easement and that he failed to demonstrate the Saltmans' fraudulent intent. The Saltmans contend that the district court correctly concluded that Marcantel's claim failed because (1) the Saltmans had no duty to disclose the Easement and (2) Marcantel failed to adduce sufficient evidence of the Saltmans' allegedly fraudulent intent. We disagree.

#### 1. Duty to Disclose

Under Utah law, "sellers of real property owe a duty to disclose material known defects that cannot be discovered by a reasonable inspection by an ordinary

22

prudent buyer." *Hermansen*, 48 F.3d at 242 (quoting *Mitchell*, 31 P.3d at 575). Because the Saltmans were sellers of real property, Utah law imposed on them a duty to disclose the Easement (1) if it was material, (2) if it was known to them (which is undisputed), and (3) if it couldn't be discovered by a reasonable inspection by an ordinary prudent buyer.

Notwithstanding those clear criteria, the Saltmans argue that no duty to disclose arises if (1) the seller doesn't know that the buyer is unaware of the defect, or (2) the buyer has constructive notice of the defect. Finding no basis in Utah law for the exceptions the Saltmans would have us carve out, we conclude that the district court erred in granting the Saltmans summary judgment on this element.

> ### a. Sellers' Disclosure Obligations Apply Even If They Don't Know a Buyer Is Unaware of Material Defects

The Saltmans contend that the duty to disclose a material defect "arises, initially, from knowledge that the other party to the transaction is unaware of the defect." Appellees' Br. at 27. That is, the Saltmans argue that, unless Marcantel can prove that they knew he didn't know about the Easement, no liability attaches. But the Saltmans derive this extra requirement from an erroneous reading of *Mitchell*.

*Mitchell* nowhere suggests that a buyer can't prevail on a fraudulent-nondisclosure claim without first proving that the seller knew that the buyer was unaware of the relevant defect. As the third authority listed in a string citation, the court quoted the following portion of the Restatement (Second) of Torts: "A knows that B is not aware of the defect, that he could not discover it by an *ordinary*

23

*inspection*, and that he would not make the purchase if he knew it." *Mitchell*, 31 P.3d at 575 (brackets omitted). But as the court's emphasis makes clear, the court quoted the Restatement not for the proposition that a duty arises only if the seller knows the buyer is not aware of the defect, but as support for its explanation of "what constitutes reasonable care in the discovery of defects." *Id.* Indeed, the nub of the dispute in *Mitchell* was whether the buyer had performed an adequate inspection of the property sufficient to preclude applying the doctrine of caveat emptor. *Id.* at 575–75. In that case, the parties assumed for purposes of the appeal that the sellers had the requisite knowledge—i.e., that they knew about the cracks in the pool—so the court had no reason to announce the rule that the Saltmans impute to that decision.

Moreover, the Utah Supreme Court later explicated the knowledge element of a claim for fraudulent nondisclosure, but it never suggested that, to prevail, the buyer must prove that the seller knew the buyer was unaware of the alleged defect. In *Anderson v. Kriser*, the parties disputed whether a seller's constructive knowledge of a material defect was sufficient to satisfy the second element of a nondisclosure claim. 266 P.3d at 824. The court held that the seller must have actual knowledge of the defect to satisfy the second element. *Id.* at 825. In detailing what a plaintiff must prove that the seller knew, the court didn't require the more detailed showing that the Saltmans urge us to adopt. And we decline the Saltmans' invitation to add a requirement that the Utah Supreme Court (or any Utah court to our knowledge)

24

hasn't imposed.[11] *See Amparan*, 882 F.3d at 948 (citation omitted) ("[W]e are generally reticent to expand state law without clear guidance from [the state's] highest court.").

Finally, the Saltmans quote this sentence from *Elder v. Clawson*: "Knowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing." 384 P.2d 802, 805 (Utah 1963) (quoting 23 Am. Jur. 857, *Fraud and Deceit*, IV Concealment, Sec. 80). They ignore the next sentence:

> There is much authority . . . that if one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, *he is under a legal obligation to speak, and his silence constitutes fraud*, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge the expediency of the bargain.

> *Id.* (emphasis added) (quoting 23 Am. Jur. 857, *Fraud and Deceit*, IV Concealment, Sec. 80). In other words, the Utah Supreme Court has recognized that a seller's silence concerning his "superior knowledge" can subject the seller to liability

---

[11] Although *Mitchell* may seem inconsistent with Restatement (Second) of Torts § 551 (1977), the Third Restatement endorses the decision. *See* Restatement (Third) of Torts: Liab. For Econ. Harm § 13, cmt. d, illus. 8 (2020); *id.* rep.'s note d.

regardless of whether he *knows* the buyer is unaware of critical facts. *Id*. So too

here.[12]

---

[12] The dissent contends that Utah law requires Marcantel to prove that the Saltmans knew he was unaware of the Easement. It asserts that Utah creates a duty of disclosure "only when the seller knows of the buyer's ignorance of a defect." Dissent at 1. But it acknowledges that *Elder* identifies an instance in which a seller could be liable for nondisclosure despite being unaware that the buyer is operating under a mistaken view about a material fact, that is, when the seller has "superior knowledge" that he fails to disclose (like the Saltmans here). 384 P.2d at 805. We see no basis under Utah law to require Marcantel to show that he relied on the Saltmans "to communicate to him the true state of facts" and that the Saltmans had been "aware that [the Saltmans] knowledge [was] superior." Dissent at 3. Those additional requirements exceed *Elder*.

Nor are we persuaded by the dissent's reliance on *Barber Bros. Ford, Inc. v. Foianini*, No. 20070700-CA, 2008 WL 5257123 (Utah Ct. App. Dec. 18, 2008) (unpublished). That decision quotes *Elder* only in passing and, like the Saltmans, fails to discuss the sentence in *Elder* explaining that "much authority" holds that silence may constitute fraud when the seller withholds "superior knowledge" from a buyer. *Elder*, 384 P.2d at 805.

In addition, Marcantel should prevail even under the dissent's view of Utah law. To defeat summary judgment, Marcantel needs to show a genuine dispute of material fact about whether the Saltmans knew that he was unaware of the Easement. He did so. A jury can consider whether the Saltmans could have realistically been unaware that an experienced real estate purchaser like Marcantel would have paid over $1.7 million for the Property had he known about the Easement and its resulting limitations on development.

26

### b. Marcantel's Illusory Constructive Notice Doesn't Defeat His Fraudulent Nondisclosure Claim

The Saltmans further maintain that they had no duty to disclose the Easement because Marcantel had constructive notice of it. We disagree.[13]

As an initial matter, under the facts of this case, we're skeptical that Marcantel had constructive notice of the Easement. Utah's recording statute provides that "[e]ach document executed, acknowledged, and certified, in the manner prescribed by [Title 57] . . . shall . . . impart notice to all persons of their contents." Utah Code § 57-3-102(1). "In effect, Utah law presumes that because documents properly filed with a county recorder are available for inspection by the general public, every person has the ability to examine these documents and thus has notice of the contents in these documents." *In re Hiseman*, 330 B.R. 251, 256 (Bankr. D. Utah 2005). But while Utah law is clear that "[c]onstructive notice is imparted when documents are *properly* recorded[,]" *Johannessen v. Canyon Rd. Towers Owners Ass'n*, 57 P.3d 1119, 1123 (Utah Ct. App. 2002) (emphasis added) (quoting *U.P.C., Inc. v. R.O.A. Gen., Inc.*, 990 P.2d 945, 953 (Utah Ct. App. 1999)), it's unclear what "properly" recorded means. Without citing any caselaw, the district court ruled that Utah's

---

[13] If Marcantel had received actual notice of the Easement, that would likely preclude recovery on his fraudulent-nondisclosure claim. *See Loveland v. Orem City Corp.*, 746 P.2d 763, 769 (Utah 1987) ("We do not interpret this [disclosure] duty to extend to deficiencies in residential building lots that are easily discernible during an ordinary and reasonable investigation by a purchaser *and that are in fact known of by the purchaser* . . . . [P]urchasers are often willing to accept known deficiencies in land in exchange for a lower purchase price." (emphasis added)). But it's undisputed that Marcantel lacked actual knowledge of the Easement when he purchased the Property.

recording statute "requires only a correct 'legal description of the real property.'" App. vol. 8 at 2235 (quoting Utah Code § 57-3-105(2)). But the district court failed to consider in any depth whether an instrument that is incorrectly indexed is "properly" recorded.

Here, though recorded, the Easement was indexed incorrectly. The abstracts mistakenly recorded the Easement on the wrong section of a city block. This error produced profound consequences. On *four* separate occasions, at least three different title companies tasked with identifying encumbrances on the Property failed to locate the Easement. Attaching copies of the Summit County abstracts, a representative of Coalition Title—Marcantel's title company—explained why:

> [The abstracts] show[] that instead of the easement being posted to the Block 55 Snyder's Addition to Park City, where i[t] belongs, it was posted to the Section . . . under the Block 55. *This is how the easement was missed.*

*Id.* vol. 5 at 1431 (emphasis added).

If, as we have previously noted, "[t]he doctrine of constructive notice proceeds from a theory that a party who neglects a duty to search a title record should be imputed with notice of anything that would have been discovered upon a proper search," *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1388 n.3 (10th Cir. 1980), imposing constructive notice on Marcantel makes little sense.

> [T]he prime purpose of the recording acts is to give subsequent purchasers information regarding the title of the property that they propose to acquire. If a prior instrument is properly recorded, subsequent purchasers have an obligation to find it on the record and are considered to have constructive notice of it, even if they do not locate it. *However, it defies reason to assert that subsequent purchasers should have an*

28

> *obligation, no less the ability, to find an unknown instrument lodged in thousands of volumes of records, when it is not properly indexed in the first place.*

14 Powell on Real Property § 82.03 (2020) (emphasis added). This applies with particular force here, when multiple professional title companies—not just an ordinary buyer—failed to locate the Easement. *See Amoco Prod. Co.*, 619 F.2d at 1388 ("The doctrine of constructive notice . . . is a harsh doctrine which should be resorted to reluctantly and construed strictly."). Indeed, many states decline to impute constructive notice to subsequent purchasers when abstracting errors render futile a search of public records. *See* 14 Powell on Real Property § 82.03 n.29 (collecting cases); *Dyer v. Martinez*, 54 Cal. Rptr. 3d 907, 910 (Cal. Ct. App. 2007) ("[R]eal property purchasers . . . cannot be charged with constructive notice of documents they cannot locate . . . [T]he conclusive imputation of notice of recorded documents depends upon proper indexing because *a subsequent purchaser should be charged only with notice of those documents which are locatable by a search of the proper indexes*." (internal quotation marks and citation omitted)).[14] Although Utah's courts

---

[14] Based on their particular recording statutes, a majority of states continue to impute constructive notice to subsequent purchasers even when a document is improperly indexed (or not indexed at all). 14 Powell on Real Property § 82.03. But Utah isn't one of those states.

haven't resolved this issue,[15] we have difficulty believing they would find that

Marcantel had constructive notice here when no reasonable search of Utah's public

records would have revealed the Easement's presence.

Regardless, we needn't decide that question because we conclude that, even if

Marcantel had constructive notice, that wouldn't defeat his fraudulent-nondisclosure

claim. Because the Saltmans direct us to no decisions of the Utah Supreme Court

---

[15] Nearly a century ago, a sharply divided Utah Supreme Court considered a related question. *See Boyer*, 287 P. at 191. In *Boyer*, the plaintiff—the trustee of a bank—filed a mortgage with the county recorder in conformance with Utah's then-existing recording statute. *Id.* at 189. The county recorder entered the mortgage in the "entry book." *Id.* The mortgage was then "timely recorded, or copied, at length in the Book E of Mortgages" and "indexed in the indices of grantors, grantees, and mortgagors and mortgagees of the records." *Id.* But the entry in the index didn't describe the property; instead, it read "See record for description." *Id.* Further, the county failed to record the mortgage in the abstract record. *Id.* at 190. The mortgaged property was later conveyed to the defendant, who believed it had obtained the property unencumbered (the defendant had commissioned a title search, which failed to identify the mortgage). *Id.* at 189. The plaintiff sued, asserting that its claim to title was superior because the defendant had constructive notice of the mortgage. *Id.* The defendant argued that it lacked constructive notice because the county had failed to record the mortgage in the abstract record. *Id.* at 190. Although the court suggested in dicta that indexing errors "do[] not invalidate the notice afforded by a record otherwise properly made," it declined to "align [itself] with either the majority or minority rule on that question." *Id.* at 191. Instead, it concluded that "[i]rrespective of whether the index is considered essential to complete recording or not, the rule is that it will be sufficient if enough is disclosed by the index to put an ordinarily prudent examiner upon inquiry." *Id.* (citations omitted). Because the court concluded that the index contained sufficient information, it ruled that the defendant had constructive notice of the mortgage. *Id.* at 193.

But this case provides little help here. Our case turns not on whether the index contained a sufficient description of the Easement (it did), but whether recording the Easement in the wrong place precludes finding that Marcantel had constructive notice. *Boyer* left that question open. *See id.* at 190 (noting that "failure to correctly index" could affect whether a party had constructive notice but that the parties agreed the mortgage was indexed in the correct place).

holding that a buyer's constructive knowledge of a defect defeats a fraudulent-nondisclosure claim, we must again predict how Utah's highest court would rule. *See MTI, Inc.*, 913 F.3d at 1249.

Considering the circumstances of this case, our review of Utah's caselaw persuades us that the Utah Supreme Court wouldn't apply Utah's recording statute as a bar to Marcantel's claim. In *Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302 (Utah 1983), the Utah Supreme Court rejected an argument similar to the one the Saltmans advance here. In that case, the defendant-debtor represented that it had several properties that it would eventually sell to pay the debt it owed the plaintiff-creditor. *Id.* at 304. So the defendant assigned its interest in the sale of those properties to the plaintiff. *Id.* But the assignment erroneously included five properties that had already been sold, meaning the defendant in fact had no interest in those properties to assign. *Id.* When the plaintiff realized the error, it sued the defendant for unjust enrichment and negligent misrepresentation. *Id.* The defendant asserted that the plaintiff "had constructive notice that the trust deed notes had been paid off because deeds of reconveyance were on file with the Salt Lake County Recorder's office and therefore were a matter of public record, imparting 'notice to all persons of the contents thereof' under U.C.A., 1953, § 57–3–2." *Id.* at 307.

The Utah Supreme Court was unmoved. After noting that the defendant "cite[d] no legal authority for the proposition that [the plaintiff] had a duty to inspect those records or was bound by constructive notice," it stated that "[g]enerally a failure to examine public records does not defeat an action for a false representation

31

because in most cases there is no duty to make such an examination." *Id.* (citation omitted). At least in fraud cases, the court explained that "a plaintiff who contracts to buy property is under no duty to examine public records to ascertain the true state of title claimed by the seller." *Id.* (collecting cases). Having previously noted that negligent misrepresentation is a subset of fraud, *id.* at 305, the court concluded that the plaintiff's constructive notice didn't bar its claim, *id.* at 307. The Utah Court of Appeals later recognized this general rule that constructive notice will "not necessarily defeat a fraud claim." *Helfrich v. Adams*, 299 P.3d 2, 6 (Utah Ct. App. 2013) (citing *Christenson*, 666 P.2d at 307).

Though the Saltmans attempt to distinguish these cases on grounds that, unlike the defendant in *Christenson*, the Saltmans didn't make any affirmative misrepresentations, we remain unpersuaded that the Utah Supreme Court would rule that Marcantel's constructive notice would bar his fraudulent-nondisclosure claim. First, in *Christenson*, the Utah Supreme Court rejected the defendant's constructive-notice argument even though the misrepresentation had been made negligently, without fraudulent intent. 666 P.2d at 307. In contrast, here, if Marcantel prevails on his claim, he will have proved that the Saltmans acted with an intent to deceive. If the Utah Supreme Court declined to apply constructive notice to bar a plaintiff's claim when the defendant made an erroneous, but unintentional, misrepresentation, we doubt that it would rule that constructive notice bars Marcantel's claim when, as here, the defendants allegedly engaged in intentionally fraudulent behavior.

Second, any constructive notice to Marcantel is hard to see. Unlike the plaintiff in *Christenson*, who never attempted to check the public records, Marcantel performed his due diligence. He engaged a title company to verify whether any easements encumbered the property. But like several others before it, the title company he hired didn't discover the Easement. Under these circumstances, we are hard-pressed to believe that the Utah Supreme Court would conclude that Marcantel's supposed constructive notice relieved the Saltmans of their common-law duty to disclose.[16]

## 2.  Intent to Deceive

Even if the Saltmans owed Marcantel a duty to disclose the Easement, the Saltmans insist that his claim still fails because Marcantel failed to adduce evidence proving that they acted with fraudulent intent. To the extent that the Saltmans argue that a plaintiff asserting a fraudulent-nondisclosure claim must establish fraudulent intent as a fourth, separate element, we reject that reading of Utah law. The Utah Court of Appeals recently clarified that the Utah Supreme Court's decision in *Anderson v. Kriser* didn't graft a fourth element onto the traditional three elements that must be proved to prevail on a fraudulent nondisclosure claim. *Jensen v. Cannon*, 473 P.3d 637, 644 (Utah Ct. App. 2020) ("We have not added a fourth

---

[16] At best, Utah's law is ambiguous on this point. In such cases, we have declined to impute constructive notice to defeat a party's claim. *See Amoco Prod. Co.*, 619 F.2d at 1388–89 (refusing to impute constructive notice to Appellee because "Utah law on constructive notice from stray deeds is inconclusive and ambiguous").

33

element to the tort of fraudulent nondisclosure any more than the supreme court did in *Anderson*.").

It's true that, for Marcantel to prevail on his fraudulent-nondisclosure claim, he must present evidence from which the factfinder could at least infer the defendant's fraudulent intent. *See Anderson*, 266 P.3d at 825 (explaining that because "fraudulent intent is often difficult to prove by direct evidence[,]" it's "often inferred based on the totality of the circumstances"). But this burden is incorporated into the second and third elements of a nondisclosure claim: "For instance, fraudulent intent may be inferred for purposes of a fraudulent nondisclosure claim when a plaintiff demonstrates that a defendant had actual knowledge of a material fact and that the defendant failed to disclose that fact." *Id.*; *see also Jensen*, 473 P.3d at 651 (Harris, J., concurring) ("I read *Anderson* as explaining that the three elements, as listed, have an intent requirement already baked into them[.]"). And the reason is obvious. Knowing nothing else except that a homeowner knew of a material defect—say, a

34

termite infestation—and failed to disclose that information to a prospective buyer, a rational jury could well conclude that the seller intended to deceive the buyer.[17]

Here, it's undisputed that the Saltmans knew of the Easement and failed to disclose it to Marcantel. Under a plain reading of *Anderson*, Marcantel thus adduced all the evidence he needed to demonstrate fraudulent intent.

With little explanation and no citation to Utah authority, the district court reached the opposite result:

> Mr. Marcantel argues that intent to deceive may be inferred in this case by showing that [the Trust] had actual knowledge of a material fact and failed to disclose that fact. This may be true in certain cases, but in this case, that the Trust knew of the easement and did not disclose it is, by itself, not enough to draw the inference that the Trust intended to defraud Mr. Marcantel.

App. vol. 8 at 2231 (internal quotation marks and citation omitted). This directly contradicts the Utah Supreme Court's reasoning in *Anderson*. Indeed, the district court supported its conclusion in part by relying on a single decision from the Federal Circuit Court of Appeals, reasoning that "inferring deceptive intent is appropriate

---

[17] Nothing in *Jensen* compels a different result. *See* 473 P.3d at 642–45. That court confronted an issue not now before us, namely whether the second element of a fraudulent nondisclosure claim requires the plaintiff to prove that the defendant possessed specific knowledge. *See id.* at 644 (noting that "the specific question the district court (and now this court) have been called on to resolve" concerned "whether satisfaction of the knowledge element requires that Cannon knew of the Option Agreement and the Riverton Corners property in the abstract or that he knew that the properties were assets as defined by Jensen's discovery requests."). Because it's undisputed that the Saltmans knew about the Easement, *Jensen* has little application here. At any rate, the divided panel agreed that "fraudulent intent for purposes of a fraudulent nondisclosure claim may be inferred when a plaintiff shows that a defendant had actual knowledge of a material fact and failed to disclose that fact." *Id.*

35

only where it is the 'single most reasonable inference that may be drawn from any nondisclosure.'" *Id.* (quoting *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1334 (Fed. Cir. 2011)). But Utah courts have never imposed such constraints on the factfinder tasked with assessing the defendant's alleged fraudulent intent. The district court thus erred by imposing such a requirement.

Finally, the district court further erred when it weighed the evidence and reached a conclusion based on its assessment of that evidence. It stated: "The court is not persuaded that the Trust deliberately decided to withhold information about the easement for the specific purpose of deceiving Mr. Marcantel . . . . Rather, the most reasonable deduction from all of the undisputed evidence . . . is that the [Saltmans] had no intent to defraud Mr. Marcantel." *Id.* at 2232. Although the Saltmans' evidence apparently persuaded the district court that they lacked fraudulent intent, Marcantel presented sufficient evidence from which a reasonable jury could reach the opposite conclusion. This issue presents a genuine dispute of material fact that should have been reserved for a jury. We thus reverse the district court's grant of summary judgment on this basis.

## III. Breach of Contract

To prevail on his breach-of-contract claim, Marcantel must show: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Richards v. Cook*, 314 P.3d 1040, 1043 (Utah Ct. App. 2013) (quoting *Bair v. Axiom Design, LLC*, 20 P.3d 388, 392 (Utah 2001), *abrogated on other grounds by Gillett v. Price*, 125 P.3d 861 (Utah 2006)). On

36

appeal, the parties dispute only whether the Trust breached the REPC. Marcantel

asserts that the Trust breached three provisions of the REPC: (1) Section 10.2, (2)

section 7(h), and (3) Section 6(D) of the Disclosure Form. We address each provision

in turn.[18]

A.      REPC Section 10.2

REPC Section 10.2 states, "Seller acknowledges . . . that in reference to the

physical condition of the Property, Seller agrees to . . . disclose in writing to Buyer

defects in the Property known to Seller that materially affect the value of the

Property that cannot be discovered by a reasonable inspection by an ordinary prudent

Buyer[.]" App. vol. 2 at 407. Citing virtually no legal authority, the district court

rejected Marcantel's Section 10.2 claim on essentially the same grounds it denied

---

[18] The Saltmans assert that Marcantel didn't appeal the district court's disposition of his Section 10.2 claim, arguing that "Marcantel mentions section 10.2 only in the context of his argument that the seller disclosure form created contract duties." Appellees' Br. at 14. That's incorrect. Marcantel also advances that claim on page twelve of his opening brief when he discusses the Utah common-law duty to disclose material defects: "Paragraph 10.2 of the REPC incorporated a very similar (but slightly different) standard, requiring the Trust to disclose, *in writing*, 'defects in the Property known to Seller that *materially affect the value* of the Property that cannot be discovered by a reasonable inspection by an ordinary prudent buyer.'" Appellant's Principal Br. at 12. He continues, "[t]he District Court erred when it failed to apply the correct standard under both Utah law and the REPC in determining whether the Sewer Easement was discoverable by the reasonable inspection of the ordinary prudent buyer." *Id.* Marcantel says the court "ruled that constructive record notice eradicated both common law and contractual duties to disclose the known material defect" and asserts that this "is an incorrect application of Utah law." *Id.* at 12–13. And, though Marcantel doesn't specifically name REPC Section 10.2 again later in his argument, his discussion of contractual obligations on pages twenty-seven, twenty-nine, and thirty clearly references that section. Accordingly, Marcantel hasn't waived his argument concerning REPC Section 10.2.

him relief on his fraudulent-nondisclosure claim. The court concluded that the "obligation to disclose was never triggered because the Trust had no reason to believe the easement was undiscoverable[,]" and "the Trust had no obligation to disclose the [Easement] because Mr. Marcantel already had notice of the easement as a matter of law." *Id.* vol. 8 at 2261–62. We disagree.

First, Section 10.2 nowhere predicates the seller's disclosure obligations on whether it had a "reason to believe" a defect could not be discovered.[19] Rather, the contract imposes the disclosure obligation based on an objective assessment of whether the defect would be discovered "by a reasonable inspection by an ordinary prudent Buyer." *Id.* vol. 2 at 407. The district court's order didn't consider that issue. Accordingly, the Trust wasn't entitled to summary judgment based on any alleged subjective belief about whether the Easement was discoverable.

Second, the Trust wasn't entitled to summary judgment based on Marcantel's alleged constructive notice of the Easement. Although the district court cited authority for the proposition that Utah's recording statute afforded Marcantel constructive notice, it cited none holding that constructive notice suffices to defeat a contract claim like the one at issue here. Absent such a legal basis, the district court erred in granting summary judgment on this alternative basis.

---

[19] The district court's Memorandum Decision simply states without explanation or authority that a "reason to believe" the buyer wouldn't discover the defect is "a condition precedent to [the seller's] disclosure obligation." App. vol. 8 at 2261.

38

Moreover, a genuine dispute of material fact exists concerning whether the Easement was discoverable by a reasonable inspection by an ordinary prudent buyer. The Saltmans are free to argue—as a factual matter—that the Easement was discoverable even though the county recorder indexed it incorrectly. But Marcantel can challenge that assessment with his evidence that four professional title companies missed the Easement notwithstanding its accurate legal description. In short, a jury must ultimately decide this issue.

B.     REPC Section 7(h)

REPC Section 7 required the Trust to provide Marcantel with several enumerated documents, including, among other things, the Seller Disclosures Form, a commitment for title insurance, and a copy of any restrictive covenants affecting the Property. Section 7(h) served as a catchall "other" provision, allowing the buyer to specify any additional documents the buyer desired. Marcantel added, "Survey if one has been done." *Id.* at 406. Marcantel argues that the Trust breached this provision by failing to provide him with the Survey. The Trust responds that, in 2015, it had no survey to disclose and that it was unable to locate one despite its best efforts.

The parties offer competing interpretations of what the contract means by the Trust's obligation to provide a survey "if one has been done." Marcantel maintains that the contract should be read as requiring the Trust to provide a survey "if one exists." Appellant's Principal Br. at 39. Because it's undisputed that Old Town commissioned the Survey that was eventually used by Elliott Workgroup, Marcantel asserts that Section 7(h) obligated the Trust to produce the Survey. The Trust,

39

however, argues that the contract should be read as requiring it to provide a survey "if one has been done *by or for the Trust*." App. vol. 7 at 1947. It never commissioned a survey, so it contends it couldn't have breached Section 7(h). The Trust has the better argument here.

Applying Utah principles of contract interpretation, "we first look at the plain language [of the contract] to determine the parties' meaning and intent." *Brady v. Park*, 445 P.3d 395, 407 (Utah 2019). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 40 P.3d 599, 605 (Utah 2002) (citation omitted). "A contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016) (internal quotation marks and citation omitted). That both parties propose competing interpretations of a contract doesn't necessarily mean the contract is ambiguous. *See id.* Rather, "a reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady*, 445 P.3d at 408 (footnote omitted).

Considering the natural meaning of the words "Survey if one has been done" in the context of the contract as a whole, we conclude that Marcantel's interpretation

isn't reasonable. Reading the relevant language as requiring the Trust to provide a survey "if one exists" would have imposed an extreme burden on the Trust. The Trust would have been forced to identify and contact every prior owner of the Property to determine whether any survey had ever been prepared. And it would have had to do it under significant time constraints: The REPC required the Trust to provide the required documents in Section 7 within three days from acceptance of the contract. App. vol. 2 at 405 (providing that Seller must provide to Buyer the documents "[n]o later than the Seller Disclosure Deadline referenced in Section 24(a)); *id.* at 409 (providing that the Seller Disclosure Deadline is "3 days from acceptance"). Moreover, Marcantel's interpretation would have required the Trust to produce a survey regardless of how recently it was commissioned. But we don't believe the parties intended for this requirement to force the Trust to produce any survey previously commissioned no matter how outdated.

Instead, we read Section 7(h) together with Section 6.D. of the Seller Disclosures Form—the only other provision discussing surveys—to determine its meaning. That provision asks whether the seller is "aware of any survey(s)" prepared for the Property. *Id.* vol. 4 at 877. If "yes," the Form requests that the seller "provide a copy of any such survey(s) *in your possession.*" *Id.* (emphasis added). Read in conjunction with Section 6.D., Section 7(h) requires the seller to provide a survey "if one has been done *and is in your possession.*" In short, the relevant question isn't whether the Trust had ever commissioned a survey—or whether any prior owner

41

had—but whether the Trust had one in its possession that it could provide to the buyer.

Under this reading, the Trust didn't breach its Section 7(h) obligation. While it appears the Trust likely possessed the Survey at one time,[20] the undisputed evidence shows that it didn't have the Survey when the sale of the property closed. When the Trust's realtor informed Mr. Saltman that Marcantel was asking for a survey if one had been done, Mr. Saltman responded the same day, copying Marcantel's two realtors:

> No survey in my files.
>
> Please check with Steve Bruemmer—Elliott Workgroup Architects—to see if he or they have one. I don't think so but worth inquiring as we have worked on various preliminary development ideas from time-to-time.

*Id.* vol. 7 at 1961. The Trust's realtor contacted Bruemmer and learned that Bruemmer had already "provided everything [Elliott Workgroup Architects] had via the Dropbox link" he had sent a week earlier. *Id.* vol. 8 at 2258 n.90. The materials in the Dropbox link didn't include a survey. Because the Trust didn't possess a survey, it didn't breach Section 7(h) of the REPC. The district court properly granted summary judgment on this claim.[21]

---

[20] *See infra* Section III.C.

[21] Because we conclude that Marcantel's Section 7(h) claim fails on this basis, we decline to consider the Trust's alternative argument that the merger doctrine forecloses Marcantel's claim.

## C.     Seller Disclosures Form Section 6(D)

The Seller Disclosures Form, incorporated as part of the REPC through paragraphs 7(a) and 10.2 of the REPC, required the Trust to answer the question, "Are you aware of any survey(s) that have been prepared for the Property or any adjoining property or properties? If 'Yes,' please provide a copy of any such survey(s) in your possession." *Id.* vol. 4 at 877. Acting for the Trust, Mr. Saltman marked "no." *Id.* Because Marcantel argues that the Trust was aware of the Survey prepared for the Property, he maintains that its answer breached the contract.

In response, the Trust offers two defenses. First, the Trust contends that the Seller Disclosures Form doesn't create contractual duties. Second, it argues that, even if the Form creates contractual duties, it answered accurately that it wasn't aware of any surveys. We reject the Trust's first argument as a matter of law. As for the Trust's second argument, we conclude that a genuine dispute of material fact exists concerning whether it was aware of the Survey.

The Trust's assertion that the Seller Disclosures Form creates no contractual duties is puzzling. The REPC incorporates the Form into the contract, and the seller can't fully perform under the REPC without completing the Form. The top of the Form clearly states, "This is a legally binding document." *Id.* at 875. Additionally, both Mr. Saltman and Marcantel signed and dated the Form and initialed each page. And Mr. Saltman was required to sign and date a verification statement that the representations in the form were accurate. Each of these indicators supports our conclusion that the Form imposed legally binding contractual duties on both parties.

43

And while it appears that the Utah Supreme Court hasn't squarely addressed this issue, its caselaw suggests that seller disclosure forms do impose contractual obligations. In *Reighard v. Yates*, homebuyers sued the seller of their home for breach of contract related to the seller's representations that he wasn't aware of any mold or other moisture issues in the house. 285 P.3d 1168, 1173 (Utah 2012). The claim was based on a disclosure form like the one Mr. Saltman signed here. *Id.* The disclosure form required the seller "to disclose his actual knowledge regarding the condition of the property[,]" including "sections for mold, other moisture conditions, and exterior and exterior features, in which [seller] represented that he was not aware of" any concerns. *Id.* (internal quotation marks omitted). Although it concluded that the economic-loss rule barred the plaintiff's claim, the court acknowledged that the disclosure form otherwise imposed contractual duties on the seller. *See id.* at 1177–78 (internal quotation marks omitted) (noting that under the disclosure form the seller "was required to disclose his actual knowledge regarding . . . mold and other moisture conditions" and that "[a]ny tort duties that [seller] owed [buyer] . . . overlap with [seller's] contract duties"). Like the court in *Reighard*, we thus conclude that the

Seller Disclosures Form imposed contractual duties on the Trust related to its answers.[22]

We also conclude that the Trust wasn't entitled to summary judgment on this claim because Marcantel presented sufficient evidence to create a genuine dispute of material fact concerning whether the Trust was aware of the Survey. Marcantel submitted evidence that the Trust had made several applications to the Park City Planning Department outlining its proposed three-lot subdivision of the Property. Mr. Saltman signed the applications, each of which included the Survey. Additionally, each of the applications contained the following language in an "Acknowledgement of Responsibility":

---

[22] Though not clear in the Answer Brief, at oral argument the Trust's counsel suggested that, even if the Seller Disclosures Forms created contractual duties, the duty extended only to answering the questions and returning the form. That is, counsel argued that the REPC didn't obligate the Trust to answer the questions honestly. That argument is a non-starter. We refuse to endorse a view that would render the Form meaningless—what purpose would the Form serve if the seller is free to answer dishonestly? In any event, the Seller Disclosures Form itself imposes a duty to respond accurately. The Form requires the seller to sign the following verification:

> Seller verifies that Seller has completed this disclosure form *and that the information contained herein is accurate and complete* to the best of Seller's actual knowledge as of the date signed by Seller below. SELLER UNDERSTANDS AND AGREES THAT SELLER WILL UPDATE THIS DISCLOSURE FORM IF ANY INFORMATION CONTAINED HEREIN BECOMES INACCURATE OR INCORRECT IN ANY WAY.

App. vol. 4 at 878 (emphasis added).

45

This is to certify that I am making an application for the described action by the City and that I am responsible for complying with all City requirements with regard to this request . . . . I have read and understood the instructions supplied by Park City for processing this application. The documents and/or information I have submitted are true and correct to the best of my knowledge.

App. vol. 4 at 1056, 1081, 1108, 1134.

Notwithstanding Mr. Saltman's acknowledgment here that the documents he submitted—including the Survey—were true and correct, the Trust contended that he had never seen or heard about the Survey before being deposed in this case. Moreover, the Saltmans argue that, despite signing the applications, Mr. Saltman didn't review all the documents submitted together with them.

Here, the procedural posture of the case makes all the difference. We're required to draw all reasonable inferences in the non-movant's (Marcantel's) favor. Mr. Saltman signed the pre-development applications. He certified that the Trust had complied with the city's rules and that the contents of the applications were accurate. From this, we can—and must—draw the reasonable inference that as part of Mr. Saltman's due diligence, he reviewed the Survey before signing off on the applications. Further, based on this evidence, a reasonable jury could find that the Trust was aware of the Survey. The district court thus erred in granting the Trust summary judgment on this claim.

IV.    **The District Court's Adoption of the Saltmans' Proposed Order**

Marcantel contends that the district court erred by entirely adopting in its Memorandum Decision the Saltmans' legal analysis from their Proposed Order,

without modifying it to reflect the court's earlier oral ruling. In response, the Saltmans maintain that "[t]he practice of soliciting and using input from counsel for the prevailing party is allowed by this court's precedent." Appellees' Br. at 55. We conclude that the district court didn't reversibly err by adopting the Saltmans' Proposed Order.

### A. Standard of Review

Because we haven't done so previously, we must decide which standard of review applies when a party challenges a district court's adopting almost verbatim a proposed order granting summary judgment over an opposing party's objection that the proposed order conflicts with the court's earlier oral ruling. Marcantel asserts that our abuse of discretion standard applies, and we agree.

In *Burke v. Regalado*, we had to decide what standard of review applied to "a district court's acceptance of a party's proposed pretrial order over an opposing party's objection." 935 F.3d 960, 1005 (10th Cir. 2019). There, we decided we would review the district court's decision for an abuse of discretion. *Id.* We settled on that standard in part "[b]ecause the district court is in the best position to interpret its pretrial order." *Id.* (quoting *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)). Though we recognize the differences between a proposed pretrial order and the proposed summary judgment order at issue here, we similarly conclude that the district court is best positioned to assess whether a party's proposed order accurately reflects the court's disposition. So we review the district court's adoption of the Saltmans' Proposed Order for an abuse of discretion and will reverse only if

47

we have "a definite and firm conviction that the lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Hargrove*, 911 F.3d 1306, 1316 (10th Cir. 2019) (citation omitted).

**B.      The District Court Didn't Abuse Its Discretion in Adopting the Saltmans' Proposed Order**

Marcantel challenges both the procedure by which the Memorandum Decision came about and its substance. Marcantel argues that the district court solicited proposed orders from the parties before hearing oral argument and then adopted the Saltmans' Proposed Order without making any substantive changes to reflect the court's preliminary oral ruling. For instance, Marcantel points to the district court's colloquy with the Trust's counsel about its having answered "no" to the question, "Are you aware of any survey(s) that have been prepared for the Property or any adjoining property or properties?" App. vol. 4 at 877. At the hearing, the district court expressed serious concerns about the accuracy of that answer: "It strikes me as an odd answer in light of the trust and Mr. Saltman." *Id.* vol. 9 at 2288–89. The court queried whether it could fairly draw the inference that the Trust's answer to that question was "just flat-out not true." *Id.* But the Memorandum Decision finds no fault in the Trust's response to that question, concluding that the Trust "satisfied its contract-based obligations" "[b]y answering the question and returning the form." *Id.* vol. 8 at 2256. Marcantel argues that this and other examples prove that the district court "rubber-stamped" the Saltmans' proposed analysis and that the Memorandum

Decision fails to "accurately reflect the District Court's analysis and rulings from the bench." Appellant's Principal Br. at 52.

Although we hesitate to approve the district court's carte blanche adoption of thirty-six pages of the Saltmans' Proposed Order, we conclude that the district court acted within its discretion. We have generally permitted district courts to adopt a prevailing party's proposed findings of fact and conclusions of law. *See Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 830 (10th Cir. 2005) ("Though not made by the district judge himself, the findings are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." (internal quotation marks and citations omitted)); *Blankenship v. Herzfeld*, 721 F.2d 306, 310 (10th Cir. 1983) (upholding the district court's ruling even though it "drew heavily on defendants' articulation of the facts and the law, and its findings and conclusions are brief"). And, contrary to Marcantel's characterization, the district court didn't "rubber-stamp" the Proposed Order. In response to Marcantel's objection, the district court modified the Memorandum Decision's recitation of the undisputed facts. Moreover, consistent with its preliminary oral ruling, the district court required the Saltmans to modify the Saltmans' original proposed order to reflect the court's conclusion that the Easement constituted a defect. True, the final Memorandum Decision went into much greater depth than the district court's preliminary oral ruling. But that isn't out of the ordinary. District courts often provide a summarized version of their preliminary thoughts at a hearing before memorializing them in a written decision. That the final written decision covers additional issues not explicitly addressed at the

49

hearing doesn't mean the decision contradicts the earlier preliminary findings.[23] In short, we lack a firm conviction that the district court exceeded the bounds of permissible choice in these circumstances.

Even so, while we permit district courts to adopt proposed orders, our precedents warn that they probably shouldn't. Parties naturally draft proposed orders from an adversarial stance; that stance all but guarantees that the resulting orders won't take the balanced, thoughtful approach that nuanced legal issues require. *See Flying J Inc.*, 405 F.3d at 830 ("The court's wholesale adoption of one party's proposed findings of fact and conclusions of law provides little aid on appellate review, . . . particularly in the likely event that the adopted submission takes an adversarial stance." (citation omitted)); *Blankenship*, 721 F.2d at 310 ("[E]ven though we may not summarily reject findings adopted verbatim, we must view the challenged findings and the record as a whole with a more critical eye to insure that the trial court has adequately performed its judicial function." (internal quotation marks and citation omitted)). Accordingly, when district courts elect to adopt a

_____

[23] Besides, even if we accepted Marcantel's argument that some of the court's conclusions in its written decision contradict its oral ruling, at least in civil cases, a court's written decision generally controls over any apparent inconsistency with an earlier oral ruling. *See Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700, 705 (7th Cir. 2013) (explaining that "[i]n civil suits, the opinion and judgment are conclusive" and that district courts aren't "bound by [their] statements at oral argument" but by their written opinions); *Hong v. United States*, 363 F.2d 116, 120 (9th Cir. 1966) (finding that the court "need not, and should not" address the appellant's qualms with the district court's oral ruling "[s]ince the District Court made and entered formal and detailed findings of fact and conclusions of law").

party's proposed order, they should do so cautiously, keeping in mind the inherent risks just noted.

## CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for further consideration consistent with this opinion.

19-4055, *Marcantel v. Michael and Sonja Saltman Family Trust, et al.*

**EID**, J., concurring in part and dissenting in part.

According to the Saltmans, they did not know that Marcantel was unaware of the sewer easement. Aplt. App'x Vol. 1 at 259. Yet the majority concludes that they owed Marcantel a duty of disclosure regardless. Because Utah creates such a duty only when the seller knows of the buyer's ignorance of a defect, I respectfully dissent from section II of the majority's discussion.[1]

I reach this conclusion on the basis of three decisions of the Utah Supreme Court. First, in *Elder v. Clawson*, 384 P.2d 802 (Utah 1963), the Utah Supreme Court instructed that "[k]nowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing." *Id.* at 805 (internal quotation mark omitted) (quoting 23 Am. Jur. *Fraud and Deceit* § 80 (1939)). Second, in *First Security Bank of Utah N.A. v. Banberry Development Corp.*, 786 P.2d 1326 (Utah 1990), the court relied on § 551 of the Restatement (Second) of Torts[2] to illustrate "classifications of transactions or relations

---

[1] Specifically, I disagree with the duty analysis contained in section II.B.1.a. of the majority's discussion. I would assume, without deciding, that the sewer easement constituted a defect and therefore would not reach the issue of defect addressed in section II.A. Also, because I conclude that Utah law requires the seller to know of the buyer's ignorance, I would not reach the Saltmans' alternative grounds for affirmance, addressed by the majority in sections II.B.1.b. (constructive notice) and II.B.2. (intent to deceive). Thus, I do not join section II of the majority's discussion, but join the remainder of the majority opinion.

[2] "[A] majority of jurisdictions have either accepted § 551 [of the Second Restatement of Torts] or cited it with approval." *Lee v. LPP Mortg. Ltd.*, 74 P.3d 152, 163 (Wyo. 2003).

1

which may give rise to a duty of disclosure," *id.* at 1330, such as when "[o]ne party to a business transaction . . . *knows* that the other is about to enter into [the transaction] under a mistake as to [facts basic to it], and that the other . . . would reasonably expect a disclosure of those facts," *id.* at 1330–31 (emphasis added) (quoting *Restatement (Second) of Torts* § 551(2)(e) (Am. L. Inst. 1977)).  And third, in *Mitchell v. Christensen*, 31 P.3d 572 (Utah 2001), the court again cited § 551 of the Second Restatement for the proposition that a "duty to disclose defects exists where '*A knows that B is not aware of [the defect],* that he could not discover it by an ordinary inspection, and that he would not make the purchase if he knew it.'"  *Id.* at 575 (alteration in original) (emphasis altered) (quoting *Restatement (Second) of Torts* § 551 cmt. l, illus. 9).  These cases make clear that under Utah law, a seller who does not realize the buyer lacks knowledge of a defect owes no duty of disclosure.

The majority reads *Elder* and *Mitchell* differently.[3]  With respect to *Elder*, the majority contends that the key sentence is not the one I quote, but the one that follows it, which reads:

> There is much authority . . . that if one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open

---

[3] The majority does not address *Banberry*, despite the fact that the Utah Court of Appeals has cited *Banberry* to justify its own reliance on § 551 of the Second Restatement.  *See Maack v. Res. Design & Constr., Inc.*, 875 P.2d 570, 578–79 (Utah Ct. App. 1994) (citing *Banberry*, 786 P.2d at 1330–31), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234 (Utah 2009); *see also id.* at 575–82 (relying on the Second Restatement of Torts to also resolve issues concerning fraudulent concealment, strict liability, and application of the parol evidence rule in the fraud context).

2

to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge the expediency of the bargain.

Maj. Op. at 25 (omission in original) (quoting *Elder*, 384 P.2d at 805). According to the majority, this sentence confirms its view: the only inquiry we make regarding the knowledge of the seller is whether the seller knows of the defect itself. *See id.* at 25–26.

*Elder* is not so cabined. The majority is correct that we must not "ignore" the sentence it spotlights. *Id.* at 25. Yet the majority chooses to disregard the sentence that conflicts with its holding. Rather than pick one sentence or the other, we must give effect to both. Under *Elder*, a seller can be liable when he possesses "superior knowledge" that he does not disclose. 384 P.2d at 805 (quoting 23 Am. Jur. *Fraud and Deceit* § 80). But a duty of disclosure does not automatically apply in that circumstance. For instance, as is made clear by the very sentence the majority quotes, a court needs to further consider whether the buyer "relies upon [the seller] to communicate to him the true state of facts to enable him to judge the expediency of the bargain." Maj. Op. at 25 (quoting *Elder*, 384 P.2d at 805). And similarly, a court must determine whether the seller is aware that its knowledge is superior, because "[k]nowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing." *Elder*, 384 P.2d at 805 (internal quotation mark omitted) (quoting 23 Am. Jur. *Fraud and Deceit* § 80).[4]

---

[4] Relying on this paragraph, the majority contends that I "acknowledge[] that *Elder* identifies an instance in which a seller could be liable for nondisclosure despite

3

As for *Mitchell*, the majority dismisses that case's reliance on the Second Restatement of Torts as irrelevant to the issue at hand. It points out that there the Utah Supreme Court cited the Second Restatement "not for the proposition that a duty arises only if the seller knows the buyer is not aware of the defect, but as support for its explanation of 'what constitutes reasonable care in the discovery of defects.'" Maj. Op. at 24 (quoting *Mitchell*, 31 P.3d at 575). Thus, the majority contends that *Mitchell* provides no guidance as to how to answer the question before us. *See id.*

The majority makes a valid point, but the conclusion it draws goes too far. True, *Mitchell* did not concern the issue that the parties raise here. But the Utah Supreme Court nevertheless quoted a sentence from the Second Restatement that addresses this question. I would not be so quick to presume that that sentence is of no value as we predict how the Utah Supreme Court would rule. And critically, *Mitchell* does not stand alone. *Mitchell*, *Elder*, and *Banberry* together lead to the conclusion that we must consider a seller's awareness of what the buyer knows before a duty to disclose a defect is imposed.[5]

---

being unaware that the buyer is operating under a mistaken view about a material fact, that is, when the seller has 'superior knowledge' that he fails to disclose." Maj. Op. at 26 n.13 (quoting *Elder*, 384 P.2d at 805). As noted above, however, I understand *Elder* not to impose a disclosure duty automatically when a seller fails to disclose superior knowledge, but, rather, to call for courts to also consider other factors, including, critically, whether the seller is aware of the buyer's ignorance.

[5] The majority says that its reading of *Mitchell* "may seem inconsistent with" the Second Restatement of Torts, but that inconsistency is of no moment because the more recent Restatement (Third) of Torts has "endorse[d]" *Mitchell*. Maj Op. at 26 n.12. The majority is correct that the Third Restatement uses *Mitchell* as the basis for an illustration. *See Restatement (Third) of Torts: Liability for Economic Harm* § 13 cmt. d, illus. 8 & reporter's note d (2020). Yet the Third Restatement, unlike the majority, interprets *Mitchell* to require a buyer to demonstrate more than just the seller's

Taking a different tack, the majority turns to *Anderson v. Kriser*, 266 P.3d 819 (Utah 2011), which the majority construes as setting the limits as to what a buyer must show about a seller's knowledge to hold that seller liable for fraudulent nondisclosure under Utah law. In *Anderson*, the Utah Supreme Court addressed fraudulent nondisclosure's second element—whether "the defendant knew of the information he failed to disclose," 266 P.3d at 823 (emphasis omitted)—and held that to satisfy this element, a seller must have actual, not just constructive, knowledge of the defect, *id.* at 824–25. The majority maintains that "[i]n detailing what a plaintiff must prove that the seller knew, the [Utah Supreme Court in *Anderson*] didn't require the more detailed showing that the Saltmans urge us to adopt." Maj. Op. at 24. Thus, we should "decline the . . . invitation to add a requirement that the Utah Supreme Court . . . hasn't imposed." *Id.* at 24–25.

The majority's reliance on *Anderson* is misplaced. As noted, *Anderson* concerned the second element of a nondisclosure claim—whether the seller knew the defect existed. *Anderson*, 266 P.3d at 823–24. The first element—whether the seller owed a duty of disclosure—was not contested. *Id.* at 822. The Utah Supreme Court, therefore, had no

---

knowledge of the defect itself, for the relevant illustration provides that a seller owes a duty to disclose when he "knew of the defects before the sale, *knew they would be of great importance to Buyer, and knew they were not discoverable by the use of reasonable care*." *Id.* § 13 cmt. d, illus. 8 (emphasis added). More generally, the Third Restatement states that a duty of disclosure exists only when a seller "*knows* that the other party to [the] transaction is mistaken about a basic assumption behind it." *Id.* § 13(c) (emphasis added). Thus, both the Second and Third Restatements repudiate the conclusion the majority reaches.

cause in *Anderson* to opine on the extent to which a seller's knowledge bears on the existence of a duty to disclose.[6] And more importantly, notwithstanding the majority's claim to the contrary, the Utah Supreme Court *has* indicated that we should consider a seller's knowledge as part of the duty-to-disclose inquiry—in *Elder*, *Banberry*, and *Mitchell*.

Even if the decisions of the Utah Supreme Court left doubt as to how to answer the question presented, I would follow the lead of the Utah Court of Appeals, which held in *Barber Bros. Ford, Inc. v. Foianini*, 2008 UT App 463, No. 20070700-CA, 2008 WL 5257123 (Utah Ct. App. Dec. 18, 2008) (McHugh, J.) (unpublished), that a party to a transaction who is unaware of the other party's ignorance owes no duty of disclosure. *See Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) ("The decision of an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)).[7] In *Barber Bros.*, a father cosigned his son's application for an auto loan. 2008 WL 5257123, at *1. But the son, as

---

[6] Even though the parties in *Anderson* did not dispute the duty-of-disclosure element, the Utah Court of Appeals stated in dicta that a builder-contractor categorically owes no duty of disclosure when it sells a lot to a buyer but another developer subsequently builds a home on the lot. *Anderson*, 266 P.3d at 823. This statement was error, so the Utah Supreme Court corrected the court of appeals. *Id.* at 827. But that issue has no relation to whether and how a seller's knowledge affects a seller's duty to disclose.

[7] Although *Barber Bros.* is unpublished, under the Utah Rules of Appellate Procedure "unpublished decisions of the Court of Appeals issued on or after October 1, 1998[] may be cited as precedent." Utah R. App. P. 30(f).

part of the transaction, traded in a truck that "had previously been chipped," an "event[] that voided the factory warranty." *Id.* Rather than disclose this issue, the son represented that the truck had no defect. *See id.* at \*2. After the buyer realized it had been misled, it attempted to hold the father liable for the son's deceit by asserting a claim for fraudulent nondisclosure. *Id.* at \*1.

The Utah Court of Appeals rejected the buyer's claim. Even though the father had cosigned the application, the court explained that "[k]nowledge that the other party . . . is acting under a mistaken belief . . . is a factor in determining that a duty of disclosure is owing." *Id.* at \*2 (alteration and omissions in original) (internal quotation marks omitted) (quoting *Elder*, 384 P.2d at 805). And in this instance, "there [was] nothing to suggest that [the father] knew [his son] had told [the buyer] that the truck had not been chipped." *Id.* Thus, the father owed no duty of disclosure to the buyer. *Id.* at \*1–2. The same logic applies here.

The majority disagrees. It says that even if we follow *Barber Bros.*, a genuine dispute of material fact remains because "[a] jury can consider whether the Saltmans could have realistically been unaware that an experienced real estate purchaser like Marcantel would have paid over $1.7 million for the Property had he known about the Easement and its resulting limitations on development." Maj. Op. at 26 n.12. Yet "[i]n a response to a motion for summary judgment, a party cannot rest . . . on speculation, or on suspicion." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988); *see also, e.g., Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (same). And that is all that Marcantel offers here.

In sum, under Utah law, a seller who is unaware that a buyer lacks knowledge of a defect owes no duty to disclose. I respectfully dissent from section II of the majority's discussion holding otherwise.